**Kerry Max COOK, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 71855.

Court of Criminal Appeals of Texas, En Banc.

Nov. 6, 1996.

Rehearing Denied March 19, 1997.

**624**

Paul Nuegent, Winston E. Cochran, Jr., Houston, for appellant.

Edward J. Marty, Asst. District Attorney, Tyler, Matthew Paul, State's Atty., Austin, for State.

Before the court en banc.

### OPINION

MANSFIELD, Judge.

Appellant was initially indicted for this offense, a capital murder alleged to have been committed in Smith County in 1977, in 1978. He was convicted and was sentenced to death. We affirmed his conviction and death sentence in 1987. *Cook v. State*, 741 S.W.2d 928 (Tex.Crim.App.1987). Following the Supreme Court's vacating and remanding of our judgment,[1] we reversed the judgment and remanded the cause to the trial court. *Cook v. State*, 821 S.W.2d 600 (Tex.Crim.App. 1991). In 1992, appellant's first retrial ended in a mistrial after the jury was unable to reach a verdict.

In 1994, appellant was tried a third time.[2] The third trial resulted in appellant's conviction. Appellant was sentenced to death after the jury answered both special issues in the affirmative. Direct appeal to this Court is automatic. Tex.Code Crim.Proc. Art. 37.0711, § 3(j) (now Art. 37.071, § 3(h)). Ap-

pellant raises fifty-five points of error. We reverse and remand.

The complainant, Linda Jo Edwards, was involved in an affair with James Mayfield, a married man, for the eighteen month period prior to her murder. Approximately three weeks before the complainant's death, Mayfield left his wife and moved into an apartment with the complainant. During its investigation of the crime, the Smith County District Attorney's office found that Mayfield's sixteen-year-old daughter, Louella, had made repeated death threats against the complainant to third parties as well as one directly to the complainant just a few days before the murder.

Mayfield ended the affair and moved back to his wife's house in May of 1977. The complainant subsequently tried to kill herself but, after being found unconscious by Mayfield and brought by him to the hospital, recovered. After her recovery, she moved into an apartment with Paula Rudolph, at the same complex where she had previously lived with Mayfield. Mayfield's affair with the complainant became public after her suicide attempt and contributed to the loss of his position as Dean of Learning Resources at Texas Eastern University in late May of 1977.

In early June of 1977, appellant, who lived in Dallas, moved into an apartment with James Taylor. The apartment was in the same complex as the complainant's. At trial, Rodney and Randy Dykes, Taylor's nephews, testified appellant told them he had watched a woman undress through the window of an apartment while returning from the pool.[3] The following day, appellant sent Rodney over to two females at the pool, one of whom matched the complainant's description, to tell them appellant was interested in them. Rodney testified they expressed no interest in appellant. Appellant and Rodney then left the pool, returned to the apartment and ate supper. Appellant left after dark.

---

**1.** *Cook v. Texas,* 488 U.S. 807, 109 S.Ct. 39, 102 L.Ed.2d 19 (1988).

**2.** The first two trials were conducted in Smith County; the third trial was held in Williamson County.

**3.** It was established at trial the window was to the apartment complainant shared with Paula Rudolph. Other testimony at trial established the complainant was careless about closing the curtains and was often seen, nude, through the window of her apartment.

Appellant returned later that night. Rodney testified he gave appellant a back rub and noticed "hickeys" on appellant's neck, which he had not observed earlier.

On June 9, appellant and Robert Hoehn, who arrived at Taylor's apartment at about 10:30 PM, watched a cable move, *The Sailor Who Fell from Grace with the Sea*, which involved a mutilation of a cat and an insinuation of a genital mutilation of a seaman by a group of children. During the movie, appellant and Hoehn went to the pool for awhile. On their way to the pool, appellant showed the complainant's window to Hoehn and told him an attractive woman lived there. They returned and watched the rest of the movie. During the mutilation scene, appellant masturbated. Hoehn testified they left for the store to get cigarettes at about midnight and returned about 12:30 AM.[4] Hoehn dropped appellant off at the entrance to the apartment complex instead of dropping him off directly at Taylor's apartment, and drove away.

Until about 10:30 PM on June 9th, the complainant was at an apartment of some friends. She informed her friends she had to return to her apartment because her roommate, Rudolph, was leaving about 10:30 PM and she needed to get home before she left. Rudolph testified she returned to the apartment shortly after 12:30 AM. She saw a man through the open door to the complainant's bedroom and assumed it was the complainant's boyfriend, Mayfield. She testified she told him, in effect, "it was her and don't worry about it." Although he did not look like Mayfield, it was dark and she decided it must have been him and went to her room after the man closed the door to the complainant's room.

When Rudolph got up the next morning, she discovered the complainant's body. The autopsy disclosed she had been struck in the head with a statue, stabbed numerous times and severely mutilated, most notably in the genital area. Fingerprints subsequently identified as appellant's were found on the sliding glass door to the patio of complainant's apartment. Appellant was subsequent-

ly arrested and indicted for the capital murder of complainant.

In his third and fourth points of error, appellant contends the Due Process Clause of the Fourteenth Amendment to the United States constitution and the Due Course of Law provisions of Articles I, Sections 13 and 19, of the Texas Constitution prohibited appellant's second retrial because the Smith County District Attorney's Office engaged in egregious prosecutorial misconduct during the period of time commencing with the murder investigation and including appellant's first two trials.

This case presents an issue of first impression, namely, whether prosecutorial misconduct, magnified by the passage of over fourteen years and the death of a key witness, can so degrade the normal workings of justice that a fair trial becomes impossible and thus retrial is forbidden under due process and due course of law principles.

■ During its investigation of the crime, the Smith County District Attorney's Office found that Mayfield's sixteen-year-old daughter, Louella, had made repeated death threats against complainant to third parties as well as one directly to complainant just a few days before the murder. The investigation also revealed Louella falsely identified herself as an investigator with the Tyler Police Department to the manager of the apartment complex where complainant lived and told the manager that she was investigating a homicide involving Jim Mayfield and a Linda Jo Edwards (this conversation took place two weeks before Edwards' murder.) The district attorney did not reveal this information to appellant until 1991, fourteen years after the murder. Additionally, a report drafted by a Tyler Police Department sergeant, in which he states he "personally knows Louella to be mentally and emotionally unstable, very hyperactive and a pathological liar," was not revealed to appellant until 1991. The only two witnesses who supported James Mayfield's alibi that he was asleep at his wife's house at the time complainant was murdered were his wife and Louella. Failure to provide appellant with the potentially

4. Hoehn is now deceased.

exculpatory information concerning Louella Mayfield was prosecutorial misconduct violative of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Other prosecutorial misconduct in this case included the following:

1. Misrepresentation during appellant's first trial of a deal made by the Smith County District Attorney's Office with Edward "Shyster" Jackson, who was in custody awaiting trial on a murder charge. In exchange for having the pending murder charge reduced to involuntary manslaughter with a two-year sentence, including credit for time served, Jackson testified appellant made a jailhouse confession that he killed complainant. The State implied during closing argument it had made no deal with Jackson in order to procure his testimony. After he was released, Jackson admitted his trial testimony was a total fabrication. This information was not provided to appellant until 1991.

2. The district attorney's office failed to reveal to appellant it possessed evidence appellant and complainant knew each other. Despite having this evidence, the State presented, at appellant's first trial, its theory that appellant and the complainant were total strangers and he had not been to her apartment until the evening of her murder. This potentially exculpatory evidence not revealed to appellant included grand jury testimony by Rodney Dykes that appellant told him he met complainant at the pool three or four days prior to her murder and then went to her apartment, where he received "passion marks on his neck." The State did not provide this "highly exculpatory" testimony to appellant until years after appellant's first trial.

3. The State failed to reveal to appellant, at his first trial, a prior inconsistent statement by a key prosecution witness, Robert Hoehn. Hoehn testified at appellant's first trial he had homosexual sex with appellant shortly before the murder and that appellant had watched, and became aroused by, a movie, *The Sailor Who Fell from Grace with the Sea,* that evening. This highly prejudicial testimony was directly contradicted by Hoehn's earlier sworn testimony before the grand jury in which, while admitting he was

a homosexual, he said he had not had sex with appellant. He also testified appellant paid no attention to the movie. The State did not disclose Hoehn's grand jury testimony to appellant until after commencement of appellant's second trial and after Hoehn's death. Hoehn's death also made it impossible for appellant to impeach Hoehn's testimony with a prior statement he made to the district attorney's office that he had not had sex with appellant.

4. The State introduced misleading testimony at appellant's first trial as to the age of fingerprints found to be those of appellant and found at complainant's apartment. The State's witness testified they were six to twelve hours old, which placed appellant at the scene at the time the murder was committed. However, the witness, Sgt. Collard, admitted, in writing and in response to a grievance filed against him in 1978, his "expert opinion" regarding the age of the fingerprints was not in fact an expert opinion, was a mistake which could not be supported by any scientific evidence or by any other latent fingerprint expert, and that the district attorney had pressured Collard to present the false and misleading evidence against Collard's wishes. Collard's written statement was not disclosed to appellant until 1992.

5. Attempts by an assistant district attorney to interview appellant without the presence of appellant's attorney and without the knowledge of appellant's attorney prior to appellant's second trial.

Due process requires the State to disclose exculpatory evidence to one accused of a crime. *Brady v. Maryland, supra; Moore v. Illinois,* 408 U.S. 786, 794–795, 92 S.Ct. 2562, 2567–68, 33 L.Ed.2d 706 (1972); *Kyles v. Whitley,* 514 U.S. 419, —— ——, 115 S.Ct. 1555, 1568–69, 131 L.Ed.2d 490 (1995). In *Kyles* the Supreme Court held the government has the duty to disclose exculpatory evidence, even in the absence of a request by the defendant, if the withheld evidence, considered as a whole, results in a "reasonable probability" that a different result would have occurred. The defendant is only required to show that the government's failure to disclose the exculpatory evidence "undermined confidence in the outcome of the trial."

Whether the prosecutor or the police acted in good or bad faith in failing to disclose exculpatory evidence is immaterial. *Kyles v. Whitley,* 514 U.S. at ——–——, 115 S.Ct. at 1568–1569.[5]

■ Failure to disclose impeachment evidence favorable to the defendant upon request is constitutional error only if its suppression undermines confidence in the outcome of the trial. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). *See also, Thomas v. State,* 841 S.W.2d 399, 402 (Tex.Crim.App. 1992).

■ Prior to his third trial, appellant filed a pretrial habeas corpus petition in which he averred prosecutorial misconduct was so egregious as to have deprived him of the ability to present an effective defense. Therefore, state and federal constitutional due process, due course of law and double jeopardy provisions barred his retrial. The habeas court's findings established numerous undisputed acts of misconduct by the district attorney's office, some of which are described above. While we are not bound by the findings of the habeas court, we generally accept them, absent an abuse of discretion. *Ex parte Brandley,* 781 S.W.2d 886, 887 (Tex. Crim.App.1989); *Ex parte Adams,* 768 S.W.2d 281 (Tex.Crim.App.1989); *Ex parte Castellano,* 863 S.W.2d 476, 485–486 (Tex. Crim.App.1993). The habeas court denied relief, however.

■ Prosecutorial and police misconduct has tainted this entire matter from the outset.[6] Little confidence can be placed in the outcome of appellant's first two trials as a result, and the taint, it seems clear, persisted until the revelation of the State's misconduct in 1992.

Much of the earlier misconduct by the State was cured prior to appellant's third trial. The misconduct with respect to Edward "Shyster" Jackson's testimony was not relevant as Jackson did not testify at the third trial. The State's misconduct with respect to Collard's testimony was corrected by full disclosure prior to appellant's third trial. Rodney Dykes and his brother were available and testified at appellant's third trial, providing appellant an opportunity to correct the State's suppression of statements the Dykes brothers made which were exculpatory with respect to appellant.

The death of Robert Hoehn, however, precluded appellant from investigating the contradictions between his testimony at trial and before the grand jury, and between his trial testimony and his statement to the police. Hoehn's testimony was crucial as it placed appellant near the scene of the murder in an aroused emotional state at the time of its commission. Hoehn's trial testimony also contradicted his statement to the police concerning whether appellant watched a movie on television which, the State averred at trial, inflamed appellant just prior to the time the murder was committed. Use of Hoehn's testimony at appellant's third trial, under these circumstances, casts serious doubts as to the fairness of appellant's third trial and the reliability of the proceeding against him. Accordingly, reversal of appellant's conviction is mandated by the Due Process Clause of the United States Constitution as well as the Due Course of Law provision of the Texas Constitution.

■ We do find that, consistent with constitutional principles, a retrial of appellant is possible, assuming, of course, the State elects to retry him. However, we are convinced that Hoehn's unavailability for any retrial, given the Supreme Court's holdings in *Bra-*

---

**5.** In *Kyles,* the Supreme Court, in effect, held the prosecutor is responsible for material exculpatory information in the possession of the police, and reversal of a criminal conviction for failure to disclose material exculpatory information to the defendant by the police is mandated by *Brady, supra,* even if the prosecution was not aware of the existence of such information. In the present case, the habeas court found the prosecutor knew of several items of material exculpatory information described above in the possession of the police but failed to disclose them to appellant.

**6.** We note the acts of misconduct on the part of the Smith County District Attorney's Office and the Tyler Police Department took place nearly twenty years ago and we do not imply any complicity in said acts on the part of the current District Attorney or current members of the Tyler Police Department.

dy, *Moore, Kyles* and *Bagley,* would bar use of his testimony from appellant's prior trials or any statements he may have given concerning this case at any such retrial. Clearly, any testimony or statements of Hoehn are tainted by the State's prior misconduct, which cannot now be corrected by cross-examination or other means and fundamental fairness and due process forbid their use at any retrial of appellant.

With respect to Louella Mayfield, we recognize the passage of time, coupled with the State's earlier suppression of evidence which strongly suggested she was a viable suspect in the murder, has complicated appellant's opportunity to investigate and develop a potential defense based on her as a viable suspect. *See Ex parte Mitchell,* 853 S.W.2d 1 (Tex.Crim.App.1993). The record, however, does not state Louella is unavailable.

If appellant is retried, he will be free to call Louella as a witness and will have available, at the very least, the Tyler Police report labeling her as a pathological liar, as well as the results of the investigation placing Louella at the complainant's apartment complex at or near the time of the murder and describing threats she made against complainant. While the combination of the passage of many years plus State misconduct may well complicate appellant's construction of a defense based on Louella's being a viable suspect, the record does not support appellant's contention that it is not, at this late date, possible to do so.[7]

For the reasons stated above, we sustain appellant's third and fourth points of error, reverse the judgment of the trial court and remand this cause for further proceedings consistent with this opinion.

· CLINTON, J., not participating.

---

**7.** Because we find that it is possible, consistent with the Supreme Court's holding in *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), to neutralize the taint of the State's prior misconduct while preserving society's interest in prosecution of criminal activity by reversal and remand, we reject the remedy advocated by appellant, namely dismissal of the prosecution with prejudice and thereby precluding retrial.

BAIRD, Judge, concurring and dissenting.

Appellant was indicted for the offense of a capital murder alleged to have been committed in Smith County in June of 1977. *See,* Tex.Penal Code Ann. § 19.03. In 1978, appellant was convicted of the alleged offense and sentenced to death. We affirmed. *Cook v. State,* 741 S.W.2d 928 (Tex.Cr.App.1987). However, the United States Supreme Court vacated our judgment and remanded the case to this Court. *Cook v. Texas,* 488 U.S. 807, 109 S.Ct. 39, 102 L.Ed.2d 19 (1988). On remand, we reversed the judgment of the trial court. *Cook v. State,* 821 S.W.2d 600 (Tex.Cr.App.1991). In 1992, appellant was re-tried but a mistrial was declared when the jury failed to reach a verdict after five days of sequestered deliberations.[1] In 1994, appellant was tried again.[2] The third trial resulted in a conviction and the jury affirmatively answered the two punishment issues submitted under Tex.Code Crim.Proc.Ann. art. 37.0711, § 3(b). Appellant was sentenced to death. *Id.,* at § 3(g). The majority sustains appellant's third and fourth points of error and remands the case to the trial court. For the following reasons, I concur in the decision to sustain those points, but I dissent to the decision to remand the case.

## I. Introduction

In his third and fourth points of error appellant contends the due process clause of the United States Constitution and the due course of law provision of the Texas Constitution were offended by his retrial. Appellant argues that under the facts of his case, a fair trial is impossible after fourteen years of suppressed prosecutorial misconduct and that retrial would offend the most basic understanding of fundamental fairness. Appellant raised these arguments in a pre-trial habeas corpus petition prior to his second and third trials. The 26th District Court

---

**1.** The jury was deadlocked six to six on the charge of capital murder, and six to six on the lesser included offense of murder.

**2.** The third trial occurred in Williamson County upon a *sua sponte* change of venue by the trial judge. The first and second trials were conducted in Smith County.

(third trial) did not conduct habeas corpus hearings but adopted the findings of fact and conclusions of law of the 241st District Court (second trial). Both courts denied the requested relief.[3]

This case presents a question of first impression, namely whether prosecutorial misconduct, magnified by the passage of fourteen years and the death of a key witness, can so degrade the normal workings of justice that a fair trial becomes impossible, and thus, retrial is forbidden under double jeopardy and due process principles.[4] Parts II and III and IV of this opinion will review the State's misconduct, assess its ill effects to both appellant's ability to present a defense and to the State's ability to prosecute a trial resulting in a verdict worthy of confidence. Part V will address the appropriate remedy.

## II. The Constitutional Role of the Prosecutor

At the beginning, it is important to review the State's constitutionally imposed duty to investigate and prosecute criminal charges with fairness.

Due process obliges the State to disclose exculpatory evidence to one accused of a crime. This obligation originates in early 20th century strictures against misrepresentation by members of the bar and is most prominently associated with the United States Supreme Court's decision in *Brady v. Maryland,* 373 U.S. 83, 86, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) (relying on *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), and *Pyle v. Kansas,* 317 U.S. 213, 215–216, 63 S.Ct. 177, 178, 87 L.Ed. 214 (1942)). *Brady* held "that

the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.,* 373 U.S. at 87, 83 S.Ct. at 1196–98; *see also, Moore v. Illinois,* 408 U.S. 786, 794–795, 92 S.Ct. 2562, 2567–68, 33 L.Ed.2d 706 (1972). The rationales underlying this legal obligation are basic to our notions of justice:

> Such disclosure will serve to justify trust in the prosecutor as "the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). And it will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations. *See Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3105–3106, 92 L.Ed.2d 460 (1986); *Estes v. Texas,* 381 U.S. 532, 540, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543 (1965); *United States v. Leon,* 468 U.S. 897, 900–901, 104 S.Ct. 3405, 3409, 82 L.Ed.2d 677 (1984) (recognizing general goal of establishing "procedures under which criminal defendants are 'acquitted or convicted on the basis of all the evidence which exposes the truth'") (quoting *Alderman v. United States,* 394 U.S. 165, 175, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969)). The prudence of the careful prosecutor should not therefore be discouraged.

*Kyles v. Whitley,* 514 U.S. ——, ——, 115 S.Ct. 1555, 1568–69, 131 L.Ed.2d 490 (1995).

---

3. Appellant appealed the 26th District Court's denial of relief. The Court of Appeals upheld the trial judge in an unpublished opinion. After appellant had been tried and sentenced to death, this Court dismissed appellant's petition for discretionary review without opinion on March 6, 1994.

4. In *Durrough v. State,* 620 S.W.2d 134, 138 (Tex.Cr.App.1981), Durrough contended that his third trial was barred by the doctrine of double jeopardy because of willful prosecutorial misconduct that occurred during the second trial of this case. Durrough claimed that at the second trial the prosecution failed to disclose favorable evidence regarding deals with accomplice witnesses

made in exchange for their testimony and argued that the willful prosecutorial misconduct barred any future prosecution for this offense. We rejected the appellant's contention that the alleged misconduct was alone a bar to further prosecution. However, appellant's contentions are distinct from those raised in *Durrough.* Appellant does not argue that retrial is barred merely because of the State's misconduct. Appellant argues that under the particular circumstances of this case, the prosecution's misconduct has made a fair trial impossible and that because a fair trial is impossible, due process principles require dismissal of the charges against him.

In short, under the rule of law, it is preferable that the State err on the side of caution than win its case through abuse of its power. This principle is derived from the notion that the prosecutor represents a government whose power to govern is defined by its constitutional obligation to govern with fairness. This is one of the few protections which citizens have against prosecutorial abuse of the State's resources.

To this end, in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), it became clear that even a defendant's failure to request favorable evidence did not leave the State free of all obligation to disclose exculpatory evidence. In *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Supreme Court disavowed any distinction between exculpatory and impeachment evidence for *Brady* purposes, and held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.,* 473 U.S. at 682, 105 S.Ct. at 3383 (opinion of Blackmun, J.) and 473 U.S. at 685, 105 S.Ct. at 3385 (White, J., concurring in part and concurring in judgment). *See also, Thomas v. State,* 841 S.W.2d 399, 402 (Tex.Cr.App. 1992). And recently, in *Kyles,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490, the Supreme Court reaffirmed the law's demand for fairness to a criminal defendant, extending the prosecutor's responsibility to material information within the police's knowledge.[5]

Of course, the principle of due process is general and requires fundamental fairness by the State in all of its dealings with those accused of crimes. The State, for example, has a duty to seek the truth in its investigation of crimes, and where its investigative procedures are so improper that they undermine confidence in the verdict, the accused's right to due process has been violated. *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) (eyewitness was effectively told that defendant committed the crime); *Dispensa v. Lynaugh,* 847 F.2d 211, 218 (5th Cir.1988) (defendant identified in a manner that suggested whom the witness should identify); *Ex parte Brandley,* 781 S.W.2d 886 (Tex.Cr.App.1989) *cert. denied,* 498 U.S. 817, 111 S.Ct. 61, 112 L.Ed.2d 35 (1990) (egregious misconduct by the police in the investigation of a capital murder). Due process is likewise violated where the State contrives a conviction "through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty...." *Mooney,* 294 U.S. at 112, 55 S.Ct. at 342 (State's use of perjured testimony). And, due process is offended where the State fails to correct unsolicited perjury. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). Furthermore, where the State's conviction is based in part upon the introduction of a coerced confession, a defendant's right to due process is clearly violated, *Rogers v. Richmond,* 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), and where the State conceals a material witness whose testimony is shown to create a reasonable doubt of guilt that did not otherwise exist, there is also a deprivation of due process. *Hernandez v. Estelle,* 674 F.2d 313 (5th Cir. 1981).

Moreover, it should be noted that entire amendments to the federal and state constitutions were provided to ensure that the prosecuting agent of the government behaves with fairness toward all those accused of crimes, i.e., the right to counsel, the right to confront accusers, the right to public trials, the right to a speedy trial and the right against double jeopardy. The principles embodied in these amendments provide further guidance for what fundamental fairness requires and where these principles are violated with some deleterious effect to the accused, due process has not been maintained. This is the rationale underlying the application of several federal constitutional princi-

---

**5.** The police misconduct in *Kyles* is strikingly similar to that of the State in the case at bar. *Id.,* 514 U.S. at ———— , 115 S.Ct. at 1560–65. The misconduct in the case at bar is more egregious insofar as it was perpetrated by members of the bar, at times in contradiction of the behests of the police, and in blatant disregard of the law, and the misconduct was concealed for more than fourteen years.

ples to the acts of the various state governments through the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

With these principles in mind, I will review the State's misconduct on appellant's rights and society's rights under the rule of constitutional order and on the State's ability to obtain a verdict worthy of confidence.

### III. The State's Misconduct

On December 6, 1993, prior to his third trial, appellant filed a pre-trial habeas corpus petition arguing that due process and double jeopardy principles in both the federal and state constitutions barred his retrial because prosecutorial misconduct had denied him the ability to effectively defend himself. Adopting the findings of fact and conclusions of law of the 241st District Court (Smith County), which had entertained similar arguments in a pre-trial habeas corpus petition prior to appellant's second trial in 1992, the 26th District Court (Williamson County) denied relief.

The trial courts' findings establish numerous undisputed acts of misconduct by the Smith County District Attorney's Office.[6] According to the district courts, the State suppressed evidence relating to Louella Mayfield, the sixteen-year-old daughter of Jim Mayfield. Jim Mayfield was Dean of the Library at a local university. He and the victim were involved in an adulterous relationship which had been exposed in a public scandal days before the victim's murder. The affair had cost Jim Mayfield his career.

Shortly before the victim's murder, Louella Mayfield had made death threats directly and indirectly to the victim, and, shortly *before* the victim's murder, Louella had gone to the victim's apartment complex, impersonating a police officer purporting to investigate a murder involving Jim Mayfield and the victim, and asking questions regarding the

victim. The district courts also found that the State knew and suppressed evidence that Louella was believed by at least one police officer, who knew her personally, to be mentally and emotionally unstable and a pathological liar.[8] The district courts found that the State, though in possession of this information and despite discovery dating to 1977, did not disclose this exculpatory evidence to appellant until 1991, fourteen years after the alleged offense. Indeed, the district courts found that while in possession of this information, the State informed the initial trial judge and appellant that there was no exculpatory evidence. The district courts concluded that the State's conduct constituted prosecutorial misconduct.

According to the district courts, Doug Collard, a fingerprint investigator with the Tyler Police Department, had lifted latent fingerprints, later matched to appellant, from the outside of the victim's patio door. The district courts found that on each occasion that Collard testified before the grand jury and at appellant's first trial, he had expressed the misleading opinion that the fingerprints had been placed on the patio door six to twelve hours immediately preceding their discovery. According to the courts' findings, Collard had repeatedly informed the State, prior to testifying, that he did not want to testify as to the age of the prints because there was no scientific basis for such a conclusion. Collard met sustained resistance from the district attorney and yielded to the district attorney's insistence that Collard testify about the age of the fingerprints when the State assured him that it would give him the opportunity to qualify his opinion before the jury. But, according to the district courts' findings, the State did not allow Collard to clarify his testimony. The district courts concluded that the district attorney intended to, and probably did, mislead the grand jury, the

---

6. The State does not specifically challenge appellant's factual allegations of misconduct. Indeed, the State's brief asserts: "The appellant has accurately stated the facts of the case. Any error or omission will be clarified within the context of the State's Brief."

8. Louella Mayfield was enrolled in a Tyler Police Department scouting program, the Law Enforce-

ment Explorer Scouts. Those in the program wore distinctive uniforms and participated in programs designed to teach them public safety and familiarize them with police procedures. It was through this program that officers came to know that Louella was troubled and a pathological liar. It was in her scout uniform that Louella conducted her investigation.

trial court and the jury with its presentation of Collard's testimony and that the misrepresentation was critical because it placed appellant at the apartment at the time of the victim's death. The district courts concluded that the State's insistence that Collard provide misleading testimony and the State's failure to bring out the truth during discovery or in court, as Collard requested, constituted prosecutorial misconduct.

The district courts also found prosecutorial misconduct in the failure of the State to disclose to the defense, the court, and the jury that an "understanding" of leniency existed between the State and Edward "Shyster" Jackson in exchange for his testimony regarding appellant's alleged jail house confession. While acknowledging the possibility that there could have been a breakdown in communications within the district attorney's office, the district courts concluded that such a misunderstanding did not justify the State's denial of such an agreement and the State's forceful argument to the jury, dramatically and emphatically asserting that no such "deal" existed. The district courts concluded that the State's failure to disclose the fact that Jackson's testimony was in exchange for leniency constituted prosecutorial misconduct.

The district courts found misconduct in the State's violation of appellant's right to counsel in May of 1992. When appellant was returned to the Smith County Jail to await his second trial, the assistant district attorney prosecuting the case asked to be informed of appellant's arrival. When appellant arrived, the prosecutor, knowing appellant was represented by counsel, immediately went to visit appellant without the knowledge or consent of appellant's counsel. The district courts found the prosecutor went with the intent to speak with appellant and did approach and attempt to speak with appellant at the jail. (The nature of their conversation is not completely clear from the record.) The district courts found that the State's conduct was improper and misguided but "without bad motive or evil purpose" and asserting that "if [defense counsel] can forgive [the prosecutor], so should the court." The district courts concluded

that the State's conduct did not rise to the level of prosecutorial misconduct or in the alternative, that if the conduct rose to the level of prosecutorial misconduct, "it had no effect on the 1978 trial." Because the legal standard employed "to forgive" the State's clear misconduct is unknown, the trial courts' alternative, more legal, conclusion that the State's conduct constituted misconduct should be adopted. I will defer to the trial courts' conclusion that the misconduct was harmless, though such a conclusion is suspect in view of the fact that the full extent of the conversation is unclear and that the trial judge indicates it might have been assessing only the harm to appellant's initial trial in 1978; such an assessment is irrelevant to the issue raised.

Appellant also alleged in his habeas writ that the State suppressed exculpatory statements made by Randy Dykes and Rodney Dykes. The Tyler Police Department possessed Randy Dykes' sworn statement, dated August 3, 1977, in which Randy stated that appellant had told him (Randy) that he (appellant) had met a woman fitting the victim's description at the pool and had gone, upon her invitation, to her apartment where they had sexual intercourse and she had left "passion marks" on his neck. On October 3, 1977, Randy Dykes testified to these same facts before the Smith County Grand Jury.

Appellant further alleged that the State also suppressed Rodney Dykes' October 3, 1977, grand jury testimony in which he asserted that appellant told him (Rodney) a few days before the murder that he (appellant) had been to a woman's apartment and that she had kissed him passionately and left "passion marks" on his neck. Rodney testified that appellant did in fact have marks on his neck.

Appellant also alleged that the State had also suppressed exculpatory grand jury testimony and exculpatory statements given to the State by Robert Hoehn. Hoehn testified before the grand jury that appellant had told him (Hoehn) about having gone to a woman's apartment a few days before the murder and that she left "passion marks" on appellant's neck. Appellant further alleges that the State suppressed statements from Hoehn

which contradicted his trial testimony and which would have served to impeach Hoehn at trial.

These important allegations regarding the Dykes brothers and Hoehn were treated in a cursory manner by the district courts:

> The second portion of Applicant's Sixth Complaint has merit but does not amount to prosecutorial misconduct. *The Statements were exculpatory and should have been delivered to Cook's attorney for cross examination purposes in the 1978 trial.* (The Court is assuming the statements of the witnesses were given prior to said trial). However, the evidence fails to show whether the statements were *willfully* suppressed by the prosecutors or in violation of any court order relating to discovery. Accordingly, the court cannot, and declines to, find that the failure of the prosecutors to deliver such statements to defense counsel earlier constitutes prosecutorial misconduct.[9]

As the courts correctly concluded, the exculpatory grand jury testimony and impeachment evidence should have been delivered to appellant. The failure to do so constituted prosecutorial misconduct. The language of *Brady* is unequivocal: "suppression by the prosecution of evidence favorable to an accused ... *irrespective of the good faith or bad faith of the prosecution*" violated due process. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97 (emphasis added). Therefore, suppression of the exculpatory statements and testimony of Robert Hoehn and the Dykes brothers constituted prosecutorial misconduct which remained uncorrected until its revelation during the 1992 trial.

In conclusion, the State's misconduct in this case does not consist of an isolated incident or the doing of a police officer, but consists of the deliberate misconduct by members of the bar, representing the State, over a fourteen year period—from the initial discovery proceedings in 1977, through the first trial in 1978 and continuing with the concealment of the misconduct until 1992.

The next step is to determine whether of the State's misconduct has made it impossible to guarantee appellant a fair trial by either depriving appellant of the ability to defend himself or by creating a situation where the State cannot achieve a verdict worthy of confidence.

## IV. Assessing the Impact of The State's Misconduct

In *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490, the United States Supreme Court emphasized four aspects of the analysis for evaluating the impact of *Brady* violations. That analysis is useful to our evaluation of the harm arising from the State's misconduct. First, citing *Bagley*, the Supreme Court emphasized that the touchstone of materiality of *Brady* violations

> is not whether the defendant would more likely than not have received a different verdict with the evidence, *but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.* A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at ——, 115 S.Ct. at 1556, citing *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381. The Supreme Court emphasized that materiality in the *Brady* context is not a sufficiency of evidence test:

> ... A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the *favorable evidence could reasonably be taken to put the whole case*

---

9. All emphasis is supplied unless otherwise indicated.

 The parenthetical is curious since the trial courts should have known that most of the state-

ments were from grand jury testimony and, therefore, were known to the State, and were subject to appellant's pre-trial discovery motions.

*in such a different light as to undermine confidence in the verdict.*

*Kyles,* 514 U.S. at ——, 115 S.Ct. at 1566 (emphasis in original).

Thirdly, the Court emphasized that once a reviewing court has found constitutional error there is no need for further harmless error review; "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, necessarily entails the conclusion that the suppression must have had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Kyles,* 514 U.S. at ——, 115 S.Ct. at 1566 (internal quotations omitted), citing *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383–84 (opinion of Blackmun, J.), and at 685, 105 S.Ct. at 3385 (White, J., concurring in part and concurring in judgment), and *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), quoting *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Finally, the Supreme Court stressed that by definition, the impact of the *Brady* violations must be assessed in terms of the State's misconduct considered collectively. *Kyles,* 514 U.S. at ——, 115 S.Ct. at 1567.

With these principles in mind, the impact of the State's violations upon the integrity of the proceedings against appellant must be assessed. I pause to note that my concern is not with the effects of the State's misconduct on the first trial; that is not appellant's complaint. Appellant argues that because the State's misconduct was not discovered until after the passage of fourteen years, the ill effects of the State's misconduct is incurable. Specifically, appellant contends his ability to defend himself has been irreparably harmed by the State's long-silent misconduct. I must, therefore, assess the ill effects of the State's misconduct on appellant's ability to defend himself against the charges raised at his third trial and I must simultaneously assess whether, under the totality of the circumstances, the State's misconduct has impacted its own ability to ensure that the proceedings are fundamentally fair.

The State's misconduct was in some instances harmless to appellant's ability to defend himself even after the passage of fourteen years. For example, the violation of appellant's Sixth Amendment right to counsel was only harmful insofar as it shows that as late as 1992, the State was still willing to violate the law in the prosecution of this case. This incident was not shown to have affected appellant's ability to defend himself. Standing alone, this incident does not destroy confidence in the verdict of the trial, but it is part of the collective acts of misconduct which chip away at that confidence. It evinces at least a careless disregard on the part of the State to act within the rule of law.

Similarly, the State's misconduct in failing to reveal its "understanding" with Edward Jackson in exchange for his testimony against appellant was of no consequence to appellant's ability to defend himself because Jackson was not called to testify at appellant's third trial, the trial which is the subject of this review. Similarly, the State's misconduct regarding Doug Collard's testimony was not of an incurable nature. Likewise, the Dykes brothers' availability and testimony at the third trial allowed appellant the opportunity to correct the State's suppression of their exculpatory statements.

However, the passage of fourteen years has had corrosive effects on both the State's misconduct regarding Robert Hoehn's grand jury testimony and exculpatory statements, and the suppression of the information incriminating Louella Mayfield. The State's theory has been, and the State continues to present evidence that the murder was of the type committed by a stranger and not by someone who knew the victim. It was the State's contention that, frustrated by his sexual ambivalence and impotence, appellant saw the victim naked in her bedroom, broke into her apartment through the patio door, sexually assaulted and killed her, and, imitating a scene from a television movie he had just seen, sexually mutilated the victim's body, cutting and taking part of her lip and vagina as souvenirs. With this theory, the State removed from suspicion the victim's lover, Jim Mayfield and his daughter, Louella Mayfield, both of whom were well acquainted with the victim, and placed appellant, presumably a stranger, whose fingerprints were

on the outside of the victim's patio door, under suspicion. But Robert Hoehn testified before the grand jury that appellant had told him prior to the murder that he had met a girl fitting the victim's description at the apartment swimming pool and that she had invited appellant to her apartment where they had engaged in passionate sexual intercourse. Hoehn testified that appellant had "passion marks" on his neck which he claimed he received from the girl fitting the victim's description.

Hoehn's statements would have explained appellant's fingerprints on the victim's patio door and were potentially very damaging to the State's theory that this crime was committed by a stranger. As the district courts determined in their findings and conclusions, these statements were exculpatory and should have been delivered to appellant. Hoehn's testimony before the grand jury provided other exculpatory statements. For example, he testified that appellant had not paid attention to the television movie which the State claimed had inflamed appellant and inspired the victim's mutilation. Moreover, various aspects of Hoehn's testimony before the grand jury and his statements to the State contradicted incriminating statements which he made during appellant's first trial.

Hoehn died before the revelation of the State's suppression of his exculpatory and contradictory assertions. But even posthumously, he was a key witness for the State because Hoehn's testimony from the first trial was introduced at appellant's third trial. Appellant strongly objected to the introduction of Hoehn's testimony, contending the State's misconduct had robbed appellant of the opportunity to effectively cross-examine Hoehn during the first trial and that the admission of Hoehn's testimony would allow the State to benefit from its suppression until after Hoehn's death.[10] By recreating appellant's activities on the night of the murder, Hoehn is the sole witness able to place appel-

lant directly at the victim's apartment complex at the time of the murder. The importance of this testimony to the State's case is evidenced by the fact that during its nine days of jury deliberation, the jury repeatedly asked for the record of Hoehn's testimony.

Accordingly, appellant correctly argues that Hoehn's testimony was gained through the fraudulent suppression of Hoehn's statements which were unsupportive of the State's theory of the case. As previously noted, Hoehn's testimony was critical for the State's case because it placed appellant at the scene of the murder, at the time of the murder and watching the television movie which the State alleges inflamed appellant.

The State's misconduct deprived appellant of the opportunity to investigate Hoehn's contradictions and of the right to confront Hoehn with his own contradictions. The admission of prior testimony given at a trial during which the State suppressed exculpatory and contradictory grand jury testimony and statements made by the witness is offensive to notions of fundamental fairness. It undermines our system of justice with its guarantees that one accused of a crime may confront the State's witnesses with their own contradictory or exculpatory assertions and thereby clarify their statements and perhaps build his own defense.[11]

For example, in this case, Paula Rudolph, another key witness for the State, has over the course of fourteen years come to clarify her initial statements that she saw Jim Mayfield in the victim's bedroom on the night of the murder. Rudolph had by the third trial refined her statement to assert that she assumed, on the night of the murder, that the man she saw in the victim's bedroom was Jim Mayfield since he was the victim's lover. And, the State has investigated and developed its "halo" theory to explain why Rudolph saw a white-haired man, like Jim Mayfield and unlike appellant, in the victim's room.[12]

---

10. In fact, the trial judge denied appellant's request to introduce Hoehn's grand jury testimony regarding the "passion marks" on appellant's neck.

11. Indeed, according to Hoehn's own testimony and statements, suppressed and otherwise, he fit

the State's profile of the offender better than appellant.

12. Rudolph testified that she saw a white haired man in the victim's bedroom the night of the murder. It was established that Jim Mayfield had white hair and that appellant's hair was

It is not necessary to believe appellant would have built a successful defense based on evidence which the State suppressed. The point is that the State's suppression of the evidence until after Hoehn's death has denied appellant the opportunity to investigate, clarify and perhaps impeach Hoehn's testimony in the same manner as the State has developed evidence like Rudolph's testimony, through repeated clarification and investigation. Hoehn's death prior to the discovery of the State's misconduct has made it impossible to assess the full impact of the misconduct on appellant's ability to defend himself. This weighs against the State because it makes it impossible to determine whether the taint from the State's misconduct can be fully neutralized and appellant can be afforded a fair trial. Because of the State's theory of the case, the suppressed evidence could reasonably be taken to put the State's case in such a different light as to undermine confidence in the verdict. Therefore, I agree with the majority that having deprived appellant of any opportunity to pursue Hoehn's contradictory and exculpatory statements, the State cannot now use this testimony against him.

The State's suppression of the evidence incriminating Louella Mayfield also deprived appellant of the opportunity to investigate and develop a potential defense. *See, Ex parte Mitchell,* 853 S.W.2d 1, 5 (Tex.Cr.App. 1993) (Suppression of favorable evidence hampered defense counsel's ability to prepare a defense which could have created a reasonable doubt.). For fourteen years the State suppressed the fact that Louella Mayfield, apparently an emotionally and mentally unstable, angry, young woman with a motive for murder, had been to the victim's apartment complex asking questions about her. After fourteen years, appellant cannot now pursue an independent investigation to develop this potentially exculpatory evidence: it is virtually impossible, fourteen years after the fact, to retrace Louella's steps on the night of the murder, or to find witnesses who might have seen Louella at or near the scene of the

crime around the time of the crime or someplace other than where she said she was. Appellant cannot now investigate Jim or Elfriede Mayfield's whereabouts to test Louella's alibi. Moreover, potentially exculpatory evidence is lost forever; for example, the suspicious pants in the trunk of Louella's car cannot now be tested. *See,* n. 13, *infra.*

I note again that it is not that I necessarily believe appellant would have built a successful defense based on the suppressed evidence. The point is that the State's willful misconduct has denied appellant the opportunity to investigate and develop his case in the same manner as the State has developed its evidence against appellant. The State's misconduct in this instance can reasonably be taken to put its case in such a different light as to undermine confidence in the verdict, especially in view of the State's failure to present any direct evidence of appellant's guilt.

In my view the most pernicious effect of the State's egregious misconduct is that by inhibiting the natural development of appellant's defense, the State permitted its own investigation to be less than thorough. In allowing itself to gain a conviction based on fraud, the State ignored its own duty to seek the truth and thereby weakened its own ability to obtain a verdict worthy of confidence. There are various examples of the State's complacency toward its duty to search out the truth: Elfriede Mayfield, Jim's wife and Louella's mother, was not questioned by the State about her own, her daughter's or her husband's whereabouts on the night of the murder until 1992. This failure was extraordinary since Jim and Louella Mayfield claimed that they were at home with Elfriede on the night of the murder; not to mention that as the scorned wife, Elfriede had her own motives to murder the victim. The State's insistence that Doug Collard provide misleading information is another example of the complacency and illicit manipulation of the evidence on the part of the State which permeated the entire investigation of the

black at the time of the murder. The State introduced expert testimony, developed over the years, that because of the intense lighting in the victim's bedroom, which doubled as a sewing room, conditions were such that black hair could have appeared white to someone standing where Rudolph was standing.

murder. Another irregularity is found in the fact that the medical examiner failed to note in the autopsy protocol whether parts of the victim's lip and vagina had been removed. Without explanation for its absence in his original notations, the pathologist now insists that the body parts were, in fact, missing. Unfortunately, the autopsy and crime scene photographs are of such a quality that subsequent pathologists disagree as to whether it can be determined from them whether body parts are in fact missing. We note that appellant's second trial fell victim to the State's complacency during jury deliberations when the jury found the victim's sock in the leg of the victim's pants after the State had argued that appellant had carried off the souvenir body parts in the missing sock. The jury dead-locked and appellant's second trial ended in a mistrial. *See,* n. 1, *supra.*

These are only a few examples which illustrate the State's less than thorough, indeed, intentionally misleading investigation which was facilitated by its misconduct. Having suppressed evidence unfavorable to its theory of the case, the State was free to neglect the weaknesses in its own case and to manipulate the evidence to support its theory of the offense. Thus, the State suppressed its own incentive to conduct a thorough examination of the evidence, especially the evidence contrary to its theory of the case. After fourteen years, some of the weaknesses in the State's case are now impossible to correct. And, as appellant correctly argues, the State's presentation of a weak case based on less than thorough investigation increases the risk that the State's misconduct has affected the verdict; a verdict only weakly supported by the evidence is more likely to have been influenced by the State's wrongful manipulation of the evidence than a verdict based on strong direct evidence of guilt. *Mitchell,* 853 S.W.2d at 5; *Brandley,* 781 S.W.2d at 894.

In suppressing evidence unfavorable to its theory of the case, the State undermined appellant's ability to defend himself and un-dermined in its own ability to gain a verdict worthy of confidence. Against the background of an incriminating theory of events which is weakened at every turn by the State's complacency toward its truth-finding duty—a complacency facilitated in large part by the State's suppression of evidence contrary to its theory of the case—and the deprivation to appellant arising from the State's fourteen years of concealed misconduct, that misconduct can reasonably be taken to put the State's case in such a different light as to undermine confidence in the verdict.

## V. The Remedy

Remedies in criminal cases should be narrowly tailored to the injury suffered and should not unnecessarily infringe on society's interest in prosecuting criminal activity. *United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981). To this end it is necessary to identify and then neutralize the taint of the State's misconduct by tailoring the relief to assure, if possible, a fair trial. *Id.,* 449 U.S. at 366, 101 S.Ct. at 669. The usual remedy for due process violations discovered after trial is reversal of the fraudulently gained conviction and upon retrial deny the State the fruits of its transgression. *Id.*

However, other remedies might be necessary to neutralize the taint of the State's misconduct. In some instances, dismissal of the prosecution with prejudice may be warranted where a defendant suffers demonstrable prejudice, or the substantial threat thereof, and where the taint cannot be identified and neutralized by other means. In other words, dismissal with prejudice is appropriate in rare cases where it is the only means of adequately protecting an individual's rights and society's interest in checking abuse of the State's power. *Id., State v. Frye,* 897 S.W.2d 324, 330 (Tex.Cr.App.1995), citing *Phillips v. State,* 650 S.W.2d 396, 399–403 (Tex.Cr.App.1983).[13] For example, in *Frye,* the District Attorney contacted and

13. The *Morrison* Court anticipated that such egregious violations of the law might be committed by "investigative officers." The instant conduct is even more egregious because it was committed by members of the bar who were acting as officers of the court. Although the most egregious conduct occurred earlier, as late as 1992, the State showed it continued willingness to violate the law in the prosecution of this case.

interviewed Frye in violation of his Sixth Amendment right to counsel. *Frye*, 897 S.W.2d at 330, citing *Morrison*. The interview revealed the defense's theory of the case. Because Frye demonstrated a substantial threat of prejudice arising from the State's misconduct, i.e., a threat of prejudice which eluded precise identification and which could not be neutralized by other means, we held dismissal with prejudice was the appropriate remedy. *Id.* Similarly, in *Morrison*, the Supreme Court noted the appropriateness of dismissal as a remedy in cases where State misconduct of a constitutional dimension leads to permanent, rather than transitory prejudice, which cannot be purged to assure that a defendant can effectively defend himself and that he will not be unfairly convicted. · 449 U.S. at 364, 101 S.Ct. at 668.

In the instant case, the parties argue for two entirely different remedies. The State argues that no remedy is required because its transgressions were remedied when appellant's initial conviction was reversed and appellant was retried with the knowledge of the State's prior misconduct. Although the trial courts accepted this argument, I believe they missed the point; the relevant question is *not* whether appellant has knowledge of the suppressed evidence and the other instances of misconduct, but whether after fourteen years of concealment the State's misconduct can be corrected such that there is no prejudice or substantial risk of prejudice to appellant arising from the misconduct.

The State's argument is undermined by the retrial record which reveals that when given the opportunity to show that a fair retrial—free of taint from its misconduct—was possible, the State instead demonstrated its dependance on some of the tainted evidence, e.g., Hoehn's testimony. Thus, instead of supporting the State's argument, the record along with the history of this case support a conclusion that the State's own misconduct has rendered the prosecution incapable of obtaining a verdict worthy of confidence.

With that in mind, I turn to appellant's requested remedy which is dismissal of the prosecution with prejudice. The record and history of this case support appellant's contention that the State's misconduct has destroyed its ability to ensure a fair trial worthy of confidence in its result. In 1978, appellant was tried and convicted, but as we now know, this conviction was obtained through fraud and in violation of the law. Appellant's second trial resulted in a mistrial due to a hung jury. The conviction in this case came after nine days of jury deliberation and was gained in large part through Hoehn's testimony which was clearly a due process violation since that testimony occurred while the State was yet suppressing Hoehn's exculpatory and contradictory statements in violation of *Brady*.

Appellant has produced a record showing actual prejudice, in the form of Hoehn's prior testimony, and a continuing threat of substantial prejudice arising from the State's misconduct in that it robbed appellant of the opportunity to investigate and confront Hoehn with his contradictory and exculpatory prior testimony and statements, and robbed appellant of the opportunity to pursue an independent investigation of evidence potentially incriminating Louella, Jim and/or Elfriede Mayfield.[14] Fourteen years after the fact, there are no apparent means of eliminating the taint of the State's misconduct such that appellant can be restored to the position he would have been in had the

---

**14.** The State's own ineptness in its investigation of the offense created the incurable quality of its misconduct and its inability to obtain a verdict worthy of confidence. For example, the State did not discover the murder weapon, found by Rudolph's father in the closet of the victim's room, until a week after the offense. A "mysterious green leafy substance" was discovered in the closet. When Louella was interviewed shortly after the murder, the interviewing officer saw and confiscated a pair of mysteriously wet jeans from the trunk of her car. They were soiled with a green substance which was never tested. Whether this was evidence of Louella's guilt is now indiscernible since the jeans have been lost. Also, a hair was recovered from the victim's buttocks. The hair was compared with known samples from the victim, appellant, and Jim Mayfield. An expert testified at trial that the recovered hair did not match any of those three known sources. The hair was *not* compared with known samples from Hoehn, Louella Mayfield or Elfriede Mayfield.

evidence not been suppressed and turned over to appellant at the time of his first trial when the State was ordered to do so by the trial judge. This misconduct amounts to the suppression of exculpatory evidence for as long as necessary to render it useless to appellant, and then bringing him to trial.

It must also be noted that the State's misconduct does not only effect appellant's Fourteenth Amendment right to due process but also casts its shadow on constitutional guarantees to the effective assistance of counsel, to speedy trial, to confrontation, and against double jeopardy. These guarantees are applicable to the State primarily through the Due Process Clause of the Fourteenth Amendment. In *Green*, 355 U.S. at 187–88, 78 S.Ct. at 223, the United States Supreme Court eloquently explained the due process concern upon which the double jeopardy doctrine is ultimately based, stating,

> The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

In the instant case, the State's misconduct has ripened with the passage of years into a situation where the State cannot demonstrate that a fair trial, free of the taint of its misconduct, will ever be possible. Under these circumstances appellant's retrial serves no purpose but to subject him to continuing mental, emotional and financial hardships. Retrial under these circumstances would violate the most fundamental and compelling notions of fundamental fairness essential to the rule of law embodied in both the Texas Constitution and the United States Constitution. Having irreparably crippled appellant's ability to defend himself, and its own ability to uncover the truth, I do not believe the State should be permitted to abuse its power by again forcing appellant to defend himself against these accusations. Such abuse of State power is precisely what our federal and state constitutional rule of law, in general, and due process and due course of law, in particular, were intended to prohibit.

## VI. CONCLUSION

In light of the facts of this case, the usual remedy of reversal and retrial is inadequate to fully remove the taint of the State's misconduct. Under my understanding of due process principles and appropriately fashioned remedies, I would hold the due process and due course of law clauses prohibit retrial when prosecutorial misconduct so taints the truth-finding process that it renders a subsequent fair trial on the same charges impossible. *See, Morrison*, 449 U.S. at 365, 101 S.Ct. at 668; *Frye*, 897 S.W.2d at 330. Accordingly, I would reverse the judgment of the trial court and remand the case to that court to enter an order discharging appellant and precluding any future prosecution for the same offense.

OVERSTREET, J., joins this opinion.

KELLER, Judge, dissenting.

My brethren determine that although most of the State's acts of misconduct are harmless, two incidents entitle appellant to relief. One is the State's suppression of exculpatory statements and grand jury testimony given by Robert Hoehn. The other is the State's suppression of evidence incriminating Louella Mayfield. My comments will focus on those two matters. I believe, however, that this case warrants a more thorough discussion of the evidence than that given in the lead opinion and in Judge Baird's concurring and dissenting opinion. Reader, bear with me for yet a different account of the events that took place twenty years ago in Tyler, Texas.

### I. The facts

The undisputed evidence, developed at the third trial, established the following: In 1976, Jim Mayfield was dean of learning resources at Texas Eastern University. He lived with his wife Elfriede and two of their children, Bonnie and Louella. Mayfield met the victim in this case, 21 year old Linda Jo Edwards,

at the university, where she also worked. When Edwards' marriage was faltering and she needed a place to live, she moved into the Mayfield home. At some point, Mayfield and Edwards began an adulterous relationship. In December of 1976, the Mayfields moved to a lake house near Tyler; Edwards did not accompany them. The affair continued.

On May 14, 1977, while Elfriede was out of town, Mayfield and Edwards rented an apartment at the Embarcadero apartments in Tyler and moved in together. The two remained at the apartment just a few days before Mayfield decided to end the affair and go back to Elfriede. He went home on Elfriede's birthday, May 17. Soon after Mayfield moved out of the apartment, Edwards tried to kill herself by taking an overdose of pills. Mayfield found her, unconscious, and carried her to the hospital. She recovered and, toward the end of May, moved in with Paula Rudolph, who lived at the Embarcadero. Edwards' attempted suicide resulted in her affair with Mayfield being made public and Mayfield losing his job.

Appellant lived in Dallas, but in late May of 1977 he went to Tyler, where he stayed with a man named James Taylor. Taylor lived at the Embarcadero apartments.

Early in June, around Monday the 6th or Tuesday the 7th, James Taylor's twelve-year-old nephew, Rodney Dykes, came to visit him. Taylor was a truck driver and was out of town, but Rodney stayed in Taylor's apartment with appellant.

The first day of Rodney's visit appellant pointed a window out to Rodney and his brother Randy. Appellant told the Dykes brothers that one night while returning from the pool he had seen that the curtains were open a little, and he had stopped to watch the woman inside undress. Rodney and Randy later showed the police the window—it was Edwards'.

Edwards had been known to be careless about closing her bedroom curtains. Several witnesses had seen her, nude, through her window.

On the second afternoon of Rodney's visit, while at the swimming pool, appellant sent Rodney over to talk to two women, one of whom matched the description of Edwards. At appellant's direction, Rodney told the women that appellant was interested in them. They looked at Rodney as if he were crazy, laughed, and did not respond to appellant's overture. They expressed no interest in appellant.

Rodney and appellant returned from the pool to Taylor's apartment and ate dinner. Appellant left after it became dark. He returned late, after the television stations had gone off the air, and woke Rodney up. He had Rodney give him a back rub, and Rodney noticed there were "hickeys" on appellant's neck. He had not seen them earlier. Rodney left Tyler around mid-week.

Appellant spent part of the evening of Thursday, June 9, with Robert Hoehn at Taylor's apartment. When Hoehn first arrived, at around 10:35 or 10:45, appellant was watching *The Sailor Who Fell From Grace With the Sea* on cable television. Although the movie was on, Hoehn said that appellant was not paying any attention to it while Hoehn was there. After a few minutes, the two men went for a walk to the swimming pool, where they stayed for 20 or 25 minutes. On their way to the pool, appellant pointed out Edwards' bedroom window and said there was a good looking girl there. Appellant walked part way up the incline toward the apartment, and Hoehn told him to get away from the window. The two men returned to the apartment and resumed watching the movie.

In one scene in the movie, children drug a sailor in preparation, apparently, for mutilating him as they had previously mutilated a cat. During that scene appellant engaged in masturbation. The movie ended at 11:45, appellant "cleaned himself up" and Hoehn drove him to the store to get cigarettes. Hoehn estimated that they left for the store at about 12:00 or 12:05 and arrived back home at about 12:30. A witness who later timed the trip calculated that it would have taken no more than ten minutes, by which estimate Hoehn and appellant would have returned by 12:10 or 12:15. Hoehn did not drive appellant to Taylor's apartment, but instead dropped him off on the road at the entrance to the Embarcadero complex.

On Thursday, June 9, Edwards was at the Embarcadero tennis courts watching a game between Orlando Padron and Greg Smith. Padron's wife, Alma, showed up at the courts and recognized Edwards as someone she had met through a mutual acquaintance. Alma invited Edwards over and after the game the four returned to the Padrons' apartment where they had a drink. Edwards checked her watch frequently, saying that her roommate was leaving at 10:30, and Edwards needed to get home before she left. Edwards left.

Also on June 9, Rudolph received a phone call from a friend who was in town on business. She went to his hotel to have a drink with him, and returned to her apartment at some time around 12:35 or 12:40.

When Rudolph opened her apartment door, she saw a man in Edwards' room obliquely through the open door to the bedroom, and immediately assumed it was Edwards' boyfriend. As soon as she saw him, she said something to the effect of, "Don't worry, it's only me." The man was facing away from her, but heard her and spun around to face her.[1] He moved forward and closed the bedroom door. Rudolph went straight to her room, thinking "it wasn't right." She stood there for a minute thinking that it did not look like Mayfield, and wondered whether Edwards was gone and someone was trying to steal the stereo equipment. She decided that the man must have been Mayfield because there was no reason for anyone else to be there. Then she heard the sound of the patio door sliding, and heard it shut. She did not want to appear to be prying so she did not check on her roommate. Leaving her bedroom door open, as was her custom, she got ready for bed and went to sleep.

The next morning when Rudolph awakened, she discovered Edwards' body. Edwards had been struck in the head and face with a plaster "bookworm" statue, and had been stabbed numerous times with a knife and with scissors. Her body had been mutilated, the most brutal mutilation being by scissors to the genital area.

## II. Theories of the case

The defensive theory of the case appears to be that this was a "domestic" homicide; that Mayfield committed the murder in his anger at Edwards for costing him his job, and possibly out of jealousy. At the third trial, the theory included a contention (evidence of which was not allowed before the jury) that appellant met Edwards at the swimming pool, went to her apartment and had sexual intercourse with her, got "hickeys" on his neck at that time, and left his fingerprints on the inside of the glass door at that time.

The State's theory of the case was that the offense was a "lust murder," and that lust murders are not committed by people who have been in long-term intimate relationships with the victim. According to the State's theory, Mayfield was ruled out as a suspect for this reason, at least. One specific aspect of the crime that identified it as a lust murder was the removal of parts of the body. The defense tried to show that no parts of the body had been removed.

## III. Misconduct

### (a) Misconduct found to warrant reversal

#### 1. Hoehn's grand jury testimony [2]

Appellant claims that the State suppressed evidence of Hoehn's grand jury testimony. Hoehn told the grand jury that appellant told him that he (appellant) had gone to a woman's apartment a few days before the murder and she had left "passion marks" on his neck.[3] First, and most critical, this is evi-

---

1. Mayfield suffered from a hearing loss.

2. In its discussion of Hoehn's grand jury testimony, Judge Baird's concurring and dissenting opinion mentions that the jury deliberated for nine days. I note that only about three days were spent in actual deliberation on guilt/innocence.

3. In this interest of accuracy, I mention that appellant did not raise this claim in his pre-trial application for writ of habeas corpus, possibly because counsel was unaware of this specific grand jury testimony at that time. There are, thus, no findings of fact relating to this particular claim. Also, that pleading alleged a violation of double jeopardy, not due process, both of which are, of course, alleged in appellant's brief to this

dence of which appellant was aware—it was evidence of a statement that appellant himself had made. What was not disclosed was the fact that Hoehn so testified, not the fact that appellant had made the statement. Obviously, appellant knew he made the statement and he knew Hoehn knew it. To whatever extent the evidence was exculpatory, it was always available to appellant. An analysis of the materiality of the suppression should thus relate to the fact that there was grand jury testimony, and not to the substance of what Hoehn said.[4]

Second, upon hearsay objections by the State, the trial judge ruled that any testimony to the effect that appellant had told someone he had been in Edwards' apartment and/or engaged in sexual relations with her was inadmissible. So even though appellant always knew about it, and defense counsel was aware at least by the third trial that the State had this evidence, the defense could not use it. I do not see how the "suppression" of inadmissible evidence of which appellant was already aware could be prosecutorial misconduct requiring a reversal of the conviction.

Also, the defensive theory that appellant had had sexual intercourse with Edwards is inconsistent with appellant's own statements to the press. He told reporters after the first trial that he had never been inside Edwards' apartment.

And even aside from that inconsistency, what Hoehn said appellant told him is exculpatory only in a broad sense. That is, it is evidence favorable to the accused, but it is not evidence that reflects directly on appellant's guilt or innocence. If appellant did

have sexual intercourse with Edwards in her apartment, that fact does not in any way show or tend to show that appellant did not murder Edwards.

Judge Baird claims that the evidence is potentially very damaging to the State's theory that the murder was committed by a stranger. Dave Gomez, an FBI expert, testified to the characteristics of lust murders.[5] But the way I read the testimony, it is not quite correct to say the State's theory was that the murder was committed by a stranger. Gomez's testimony is summed up in his answer to the concluding question during his direct examination. He testified that this murder was not committed by anyone in a "long-term, personal relationship" with the victim. Even if believed, evidence that appellant had met Edwards at the pool a day or two before the murder and engaged in sexual intercourse with her one afternoon would not, under Gomez's testimony, rule appellant out as the perpetrator of this murder.[6]

The plurality and Judge Baird also mention Hoehn's grand jury testimony to the effect that appellant had not paid attention to the movie that had allegedly inflamed him. But the jury heard this testimony at the third trial.

Judge Baird contends that various aspects of Hoehn's grand jury testimony and his statements to the State contradicted incriminating statements he made during the first trial. The only contradictory statement that I can find is that Hoehn told the grand jury that he had not engaged in a homosexual act with appellant, when in fact he had. Before the first trial, Hoehn was granted immunity from prosecution for the homosexual conduct.

Court. The issue regarding the grand jury testimony was raised in appellant's Special Plea in Bar, filed before the third trial.

**4.** These observations about Hoehn's testimony are equally applicable to the claims regarding the suppression of the Dykes brothers' grand jury testimony.

**5.** Gomez testified that a lust murder is characterized by a focused attack on the sexually significant organs of the victim, up to and including removal of body parts. Sexual homicides have a fantasy aspect that can involve rape, mutilation or sadistic acts. At some point there is a build-up of precipitating stressors that cause the of-

fender to kill. In a sexual homicide, the sexual component of the fantasy is based on the person's sexual inadequacy, sexual immaturity, or sexual ambivalence.

**6.** Judge Baird claims that Hoehn fit the State's profile of the offender better than appellant. I disagree. There was no evidence that Hoehn was sexually ambivalent, sexually immature, or sexually inadequate. There was, however, testimony that appellant was sexually ambivalent. Evidence not before the jury in this trial also revealed appellant's sexual inadequacy on the night of the murder.

When he made the first statement, to the grand jury, he apparently did not want to subject himself to prosecution, so the evidence of what he told the grand jury is not worth much as far as impeachment.

But regardless of the reason Hoehn changed his testimony, the trial court consistently refused, at appellant's request, to let the State put on evidence of appellant's homosexual behavior.[7] The defense could not have used the contradictory testimony to impeach Hoehn unless evidence of appellant's homosexuality were admitted. Under these circumstances, I do not see how evidence that Hoehn contradicted himself on this issue helps the defense.[8]

### 2. Evidence regarding Louella

The plurality and Judge Baird both contend that the State suppressed evidence incriminating Louella, Jim Mayfield's sixteen year old daughter, and that such suppression deprived appellant of the opportunity to investigate and develop a potential defense. The primary incriminating evidence concerning Louella was brought before the jury during the third trial. Specifically, Sergeant Hayden of the Tyler Police Department testified that Captain Findley of the police called him in and said that the apartment managers of several apartments, one of which was the Embarcadero, had called him to report that a young white woman was going around the complexes saying she worked for the police. She said she was investigating a murder "involving" Mayfield and Edwards. Apparently, this incident took place around May 16 through 19. Sergeant Hayden suggested that it might be Louella, wearing her Explorer Scout uniform, so Captain Findley had Louella come in and talk to him. Sergeant Hayden was not present at that meeting and

did not know what was said. By the third trial, Captain Findley did not remember speaking to Louella about the incident.

The defense was aware before the first trial that Mayfield was a suspect and that he had a daughter who was upset with Edwards. The defense deposed Mayfield, but they neither deposed Louella nor subpoenaed her as a witness. Even though defense counsel was not made aware specifically of some of Louella's activities, counsel could have investigated at that time on the basis of what they did know.

Moreover, the incident is not as significant as it might appear. Louella's "investigation" took place weeks before the murder, evidently during the time that Mayfield was living with Edwards. Since then, Mayfield had returned home to his wife and family, and given up his affair, thus removing the immediate motive for murder.

Judge Baird notes other evidence concerning Louella, such as the "suspicious" pants, evidence of which was before the jury during the third trial. The only testimony regarding the jeans showed the following: When the police interviewed Louella after the murder, a pair of damp blue jeans was found lying flat in her trunk. Eddie Clark, the investigating officer, asked Louella why the jeans were wet, and she told him that they had gotten wet when she was wading in the lake at their lake house the evening before. Clark took the jeans to determine if they were relevant to the crime. He and Captain Collard looked at the jeans and noted that only the bottoms of the jeans were wet, up to about 6 or 8 inches from the hem. The jeans had mud on them and tiny pieces of debris that would have been on the edge of the lake. And more important, they were found in the trunk four and a half days after the murder.

---

7. In jury argument, the defense brought out the homosexual aspect of the evidence.

8. A final note on the subject of Hoehn's testimony: During jury deliberation the jury sent out a note asking to hear Hoehn's testimony regarding the events of June 9. The court reporter read back the testimony. At the end of the reading, the court reporter read beyond what was introduced at trial, reading also the beginning of the testimony that defense counsel had included in his bill of exceptions. She read to the jury:

Q. What did he tell you about looking into the window? What did he say about it?
A. He just said that that had been a girl that he had been out with on the previous Monday afternoon. He had met her at the swimming pool.

The court instructed the jury twice to disregard that portion of the statement. We presume that they followed the instruction.

There was testimony that because it was June, and hot, the jeans would have been dry if they had been in the trunk longer than from the night before they were found. The officer determined that the appearance of the jeans was entirely consistent with Louella's explanation, and that the jeans were not evidence related to the offense.

In *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 284 (1988), the Supreme Court discussed the effect of the State's failure to refrigerate clothing worn by the victim and containing semen stains or to perform timely tests on semen samples taken from the victim. The Court concluded that unless a criminal defendant can show bad faith on the part of the police, the State's failure to preserve potentially useful evidence—of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant—does not constitute a violation of the due process clause of the United States Constitution's Fourteenth Amendment. In the present case, the police made a good faith determination that the jeans were not relevant to the offense. There is no violation of due process.

Finally, and above all, it is necessary to recognize that whatever "incriminating" evidence existed against Louella, she was not the person Paula Rudolph saw on the night of the murder. Not only did Rudolph testify unequivocally that she saw a man, she testified specifically that it was not Louella. There has never been any dispute over Rudolph's testimony that the person she saw was a man. The theory that Louella murdered Linda Edwards is not consistent with that unchallenged eye-witness testimony.

Neither is it consistent with Dave Gomez's testimony. He testified that if someone were to commit a homicide for personal motives of revenge or rage, in order for it to appear as this murder did, that person would have to have a considerable amount of criminal sophistication, and probably have committed a lust murder before. He said he would not expect a sixteen year old girl to have that kind of criminal sophistication.

### (b) Misconduct found to be harmless

The plurality and Judge Baird find that the State committed other acts of misconduct, but determine that such acts were harmless. I address two of these other acts in order to clarify the nature and effect of the misconduct, and to dispel the impression created by the lead opinion and Judge Baird's opinion that, in order to secure a conviction, the State deliberately and nefariously engaged in the grossest misconduct.

Doug Collard, the fingerprint expert, testified at trial that the prints on the outside of the patio door were six to twelve hours old. At the writ hearing, however, he stated that there was no scientific basis for determining the age of prints. The courts found prosecutorial misconduct in the fact that the State insisted that Collard provide misleading testimony regarding the age of the prints. Nevertheless, Collard testified at the writ hearing that it was his personal opinion based on experience that the prints had been made six to twelve hours before the murder. And he said that after fifteen years, his experience led him to the same conclusion, "only more so." The jury was misled about a serious matter, namely, the lack of a scientific basis for Collard's opinion. But Collard's opinion always was and still is that the prints were six to twelve hours old.[9]

Judge Baird's opinion also refers to the incident in which the prosecutor, David Dobbs, spoke with appellant at the Smith County jail. I do not here repeat the conversation because it is not relevant, but it is apparent that Dobbs did not intend to violate appellant's right to counsel. The trial courts' finding that the State's conduct was improper and misguided but without bad motive or evil purpose is fully supported by the record. Dobbs found out by chance that appellant was being returned to the Smith County jail,

---

9. At the writ hearing, there was testimony that Collard had been cross-examined at the first trial about whether he was familiar with the work of another expert who said that there was no scientific basis for aging prints. At the hearing, Collard testified that "that was correct." It thus appears that Collard conceded even at the first trial that there was no scientific basis for determining the age of prints.

and on the way to his car that evening decided to go by to watch the book-in and, if possible, meet appellant's lawyer.[10] When appellant tried to discuss the case with Dobbs, Dobbs immediately tried to stop him. The trial court's comment about forgiving the prosecutor means simply that Dobbs' conduct was of such a nature that an apology was appropriate, but the error was not legally significant. It is apparent from the findings of fact that the trial court considered Dobbs' action totally inappropriate but also utterly harmless and without insidious purpose.

### (c) Materiality of misconduct

My view of the evidence differs from that of the plurality and Judge Baird. There is, as well, evidence that I believe is important but that is not mentioned in either of the other opinions. The following is, I believe, relevant to determining the materiality of any uncured misconduct on the part of the State.

First, the fingerprint evidence affects the materiality of the misconduct. At the time of appellant's first trial, one fingerprint matching appellant's had been found at the murder scene. It was on the outside of the sliding glass door to Edwards' apartment. After the first trial appellant told several people, including newspaper reporters, that he had never been in Edwards' apartment. Appellant said that he did not know the woman, but he had placed his hand on the glass door when he was window-peeping. After the first trial, however, prints from the inside of the sliding glass door were computer enhanced, and found to match appellant's. Fingerprint experts for both the State and the defense agreed that the prints on the inside of the sliding glass door could not have been made unless appellant was inside the apartment. The undisputed evidence thus shows that appellant was in Edwards' apartment.

Second is Rudolph's identification of the murderer. Rudolph identified appellant as the man she saw in her apartment the night of the murder. According to Judge Baird's opinion, Rudolph has, "over the course of

fourteen years come to clarify her initial statements that she saw Jim Mayfield in the victim's bedroom on the night of the murder." As far as I can tell from the record, Rudolph never said she saw Mayfield that night. She said instead that, although she felt uneasy about it, she simply assumed that it must have been Mayfield. She has not changed her testimony—she identified appellant and only appellant as the man she saw in Edwards' room. No one involved in the case understood Rudolph's statement to be an identification of Mayfield or treated it as such.

The third matter involves tissue missing from the victim's body. Witnesses for both the State and the defense agreed that they had never seen a domestic homicide in which parts of the body were removed. There was testimony by defense witnesses that the "missing" lip and vaginal tissue were present but simply sliced and cut beyond recognition. However, there was no dispute at all over whether some of the victim's hair had been cut from her head and removed from the scene. There was testimony that hair could constitute a trophy or a souvenir to the offender. Since the defensive theory that this was a domestic murder rather than a lust murder depended upon no "souvenirs" being taken, the fact that the hair was taken greatly diminishes the significance of whether other "souvenirs" were taken.

Fourth, there was evidence that appellant confessed. Robert Wickham testified at the third trial that at the time of the first trial, he was a reserve deputy for Smith County. He said that at one point when he was transferring appellant to the courtroom, appellant told him, "I killed her and I don't give a shit what they do to me." Wickham explained that he did not think the statement would be admissible in court, so he had not reported the incident officially. He had, however, soon afterwards recounted the incident to a highway patrolman friend named Glenn Miller. Miller testified and confirmed that Wickham had told him of the incident. Mil-

---

10. Judge Baird's opinion says that Dobbs asked to be informed of appellant's arrival. I do not find this in the record. Dobbs found out appellant was being returned when a newspaper reporter called to ask about it.

ler said he did not report the episode because the trial was already over.

## IV. Conclusion

There is evidence that should have been turned over to the defense. But as far as I can see, the evidence that the plurality and Judge Baird claim compels a reversal of the conviction is inconsistent either with the physical evidence, or with the eyewitness testimony, or with appellant's own statements. The most significant evidence that was not made available to the defense—the evidence that Hoehn told the grand jury that appellant said he had been with Edwards in her apartment—was always known to appellant and was, moreover, inadmissible. It is beyond me how the plurality can conclude that this "misconduct" should mandate a reversal. And, the plurality's arbitrary and unprecedented predetermination that Hoehn's testimony will be inadmissible at any new trial seems to me to be an unwarranted encroachment upon the authority of the trial judge.

In addition, appellant's old defensive theory contradicts his new defensive theory. He said himself that he had never been inside Edwards' apartment. Furthermore, Rodney Dykes' testimony indicated that on an afternoon a day or two before the murder, Edwards acted as if she did not know appellant. There was also a variety of evidence to the effect that Edwards would not have engaged in sexual intercourse with someone like appellant, under the circumstances described by appellant. And, even if believed, evidence that appellant was once in Edwards' apartment with her consent does not absolve appellant of guilt.

The identification by Rudolph, the fingerprints inside the apartment, the wealth of evidence supporting the conclusion that this was a lust murder, and the other evidence presented by the State dissipate the significance of the undisclosed evidence.

Appellant is entitled, of course, to present as many defensive theories as he wishes, and it is not required that his theories be consistent with each other or with the physical

evidence. But if the "favorable" evidence, like that regarding Hoehn, is contradicted by appellant's own statements, is already known to appellant, and is inadmissible, it seems to me that the suppressed evidence does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490. And if the evidence, like that regarding Louella, is made known to the jury, reversal is not required simply because one can speculate that a stronger defense might have been devised, especially if that defense is inconsistent with undisputed eye-witness testimony or physical evidence. Such is the case here.

I would, therefore, overrule points of error one through four, and proceed to consider the merits of appellant's other points of error.[11]

McCORMICK, P.J., and WHITE, J. join this opinion.

---

**11.** Obviously, because I do not believe that this conviction should be reversed at all, I do not

believe there is any bar to retrial.