NUMBER 13-04-149-CR


COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


PAUL JOSEPH SHOEMAKER, Appellant,


v.


THE STATE OF TEXAS, Appellee.

 
 

On appeal from the 404th District Court of Cameron County, Texas.

 


MEMORANDUM OPINION


Before Justices Hinojosa, Rodriguez, and Garza


Memorandum Opinion by Justice Garza


A jury found appellant, Paul Joseph Shoemaker, guilty of murder. See Tex. Pen.
Code Ann. § 19.02(1) (Vernon 2003). The trial court sentenced appellant to thirty years'
imprisonment. By seven issues, appellant challenges his conviction, contending that (1) the
trial court erred by failing to suppress the pre-trial and in-court identification of appellant, (2)
the trial court's declaration of a mistrial barred retrial for the same charge, (3) the State
committed reversible error by failing to disclose that it entered into a deal with a testifying
witness, (4) the trial court abused its discretion in denying his motion to bar prosecution, (5)
the State committed reversible error by calling a witness who refused to testify, (6) the trial
court abused its discretion in not granting a mistrial after appellant's incarceration and
criminal history were revealed to the jury, and (7) references to appellant as "white boy"
throughout trial denied appellant equal protection under the Texas Constitution. We affirm
the conviction. 

I.

In his first issue, appellant contends that the trial court erred by failing to suppress
the pre-trial and in-court identification of appellant. The State asserts that appellant waived
any error in the admission of this evidence because appellant's counsel first introduced the
complained-of evidence. We agree with the State. 

The record shows that appellant filed a motion to suppress the identification
contending the photo lineups were improper and suggestive. (1) The trial court granted the
motion to suppress the pre-trial identification but denied the motion to suppress the in-court
identification, ruling that the detective who made the lineup would be able to testify about
it. Appellant argues "this ruling permitted evidence of the suggestive pretrial identification
itself to be introduced through the testifying officer . . . ." Nonetheless, appellant's counsel
introduced the complained-of lineups into evidence at trial. (2)
 Appellant's counsel on appeal
speculates that appellant's trial counsel was placed in a difficult dilemma by the trial court's
ruling that the detective would be able to testify about the lineup. Appellate counsel states
that trial counsel "did not waive his suppression issue by not objecting specifically each time
an in-court identification was made, but rather that he adjusted his trial strategy completely
to compensate for the eventuality of Alvear's [the detective] forthcoming testimony and the
in court identification." We find appellant's argument that the issue was not waived
unpersuasive and find appellant's lack of authority in support of that contention noteworthy. The court of criminal appeals has held in similar, but distinct, situations that the
suppression issue was not preserved for review. See Moody v. State, 827 S.W.2d 875, 889
(Tex. Crim. App. 1992); Dean v. State, 749 S.W.2d 80, 82-83 (Tex. Crim. App. 1988); Harris
v. State, 656 S.W.2d 481, 484 (Tex. Crim. App. 1983); McGrew v. State, 523 S.W.2d 679,
680-81 (Tex. Crim. App. 1975). When evidence is offered during trial and defense counsel
affirmatively represents that the defendant has "no objection" to the evidence, any error in
the admission of the evidence is waived even if the error had been previously preserved by
a motion to suppress. Moody, 827 S.W.2d at 889; Dean, 749 S.W.2d at 82-83; Harris, 656
S.W.2d at 484; McGrew, 523 S.W.2d at 680-81. Even if a defendant objects to the
admission of evidence, but the same evidence is subsequently introduced from another
source without objection, the defendant waives his earlier objection. Massey v. State, 933
S.W.2d 141, 149 (Tex. Crim. App. 1996); Leday v. State, 983 S.W.2d 713, 717-18 (Tex.
Crim. App. 1994); cf. Ohler v. United States, 529 U.S. 753, 760 (2000) (stating that "a
defendant who preemptively introduces evidence of a prior conviction on direct examination
may not on appeal claim that the admission of such evidence was error"). 

Because appellant introduced the evidence himself, we hold that he waived any error
with respect to the admission of that evidence. We overrule appellant's first issue on
appeal.

II.

In his second issue, appellant argues that the trial court violated his Fifth Amendment
right not to be placed in jeopardy twice for the same offense because there was no manifest
necessity for declaring a mistrial in his case. 

The Fifth Amendment of the United States Constitution prohibits the State from
putting a person in jeopardy twice for the same offense. U.S. Const. amend V. In a jury
trial, jeopardy attaches when the jury is impaneled and sworn. Crist v. Bretz, 437 U.S. 28,
47 (1993); Hill v. State, 90 S.W.3d 308, 313 (Tex. Crim. App. 2002). But the double
jeopardy clause does not provide that, every time a defendant is put to trial, he is entitled
to go free if the trial ends in a mistrial. Hill, 90 S.W.3d at 313. An exception to this rule
exists if the first trial resulted in a mistrial that: (1) was justified under the manifest necessity
doctrine, or (2) was requested or consented to by the defense, absent prosecutorial
misconduct which forced the mistrial. See id.; Robinson v. State, 139 S.W.3d 748, 751
(Tex. App.-Corpus Christi 2004, pet. dism'd) (citing Ex parte Peterson, 117 S.W.3d 804,
810-11 (Tex. Crim. App. 2003)). Manifest necessity is not an issue in this case because
appellant consented to a mistrial. (3) Therefore, our only determination is whether appellant
did not give his effective consent to the mistrial.

The record reflects that the trial court declared a mistrial after a juror informed the
court that appellant's uncle had been married to his niece and that the marriage had ended
over five years ago. The juror stated that he did not think that the fact that his niece had
been married to appellant's uncle "would have any relevance on my opinion, but I didn't
want the problem to come up." The State objected to the juror, stating the familial
relationship with appellant as its reason, and expressed that it was willing to proceed with
eleven jurors. (4) The State further explained that it believed the juror would be prejudiced
against the State and moved to challenge him for cause. The State later withdrew its
objection and stated that they would allow the juror to proceed. 

The record further reflects that the defense stated that, had he known of the history
between the juror and appellant, he would have explored the relationship before having
chosen him as a juror. The court inquired whether appellant had assisted trial counsel in
the selection of the jury. Defense counsel answered that while appellant did assist him, he
did not think appellant recognized the juror otherwise he would have said something. The
defense then stated that if the court discharged the juror it would not be willing to proceed
with eleven jurors. The court went on to explain "both of you are in a wall and a hard place
and I think it would be unfair to the state, but most of all it would be unfair to the defendant." 
Defense counsel agreed with the court and elaborated:

[I]f I would have known about this relationship, I would have asked specific
questions about how the marriage broke up, about what his contact was with
my client, what he specifically felt about my client's uncle, his feelings to me,
it seems some resentment in the voice about the break up of the marriage,
it's his niece that was possibly hurt if she was, and my feeling is that I need
to explore that at least on the record, and if I had known if he had resentment
if that turns out to be the case, I would not have chosen this juror. I would
have struck him and I think my client is absolutely prejudiced by the selection
of this person on the jury. 

 The trial court went on to state that it was concerned that even though jurors are
instructed, in situations such as this, it is likely that information could have been elaborated
among the other members of the jury and it could subconsciously or consciously affect the
other jurors' judgment either for or against the defendant. The court stressed "it could be
against the defendant, which is what is really more important." The court further explained:

This is not a situation where double jeopardy attaches even though the jurors
were sworn, however, I'm going to let the juror go, however, I just want to say
on the record, Mr. Blaylock [appellant's trial counsel], that - - without any fault
of your own of course, maybe, not with the fault of your client, but this is
charged to the defendant, that's why I asked you earlier if you had assistance
from your client being that it was five years. This Court does not believe that
five years is such a remote - - of such remoteness that the defendant couldn't
have recognized.

 

Trial counsel responded "[t]hat's fine, Judge. I don't think there's any prosecutorial
misconduct. I didn't perceive to pursue any kind of barring subsequent prosecution
because of anything." 

 We hold that double jeopardy was not a bar to retrial because appellant effectively
consented to mistrial and not because of any prosecutorial misconduct. See Hill, 90
S.W.3d at 313; Robinson, 139 S.W.3d at 751. (5) Accordingly, appellant's second issue is
overruled. 

III.

 In his third issue, appellant contends the State failed to disclose that it entered into
a deal with a testifying witness, Roberto Alejandro Baraona, where, in exchange for
Baraona's testimony, a pending felony charge would be dismissed. 

 As an initial matter, we address the State's motion to strike appellant's
supplementation of the record. The State asserts that appellant improperly supplemented
the clerk's record. The documents on which appellant relies for his third issue, designated
as "3RD SUPPLEMENTAL CLERKS' RECORD," were filed with this Court on November 8,
2005. The State argues that the documents cannot be considered on appeal because they
are from a separate proceeding and were not introduced into evidence at the trial court
level. The State requests that we strike appellant's supplementation of the clerk's record. 
 When documents appear in the clerk's record that have not been introduced in
evidence, they cannot be considered as part of the record. See Chambers v. State, 194
S.W.2d 774, 775 (Tex. Crim. App. 1946); Webber v. State, 21 S.W.3d 726, 731 (Tex.
App.-Austin 2000, pet. ref'd). The documents contained in the 3RD SUPPLEMENTAL
CLERK'S RECORD, which relate to a separate cause, were never filed in appellant's
underlying case. Instead, on November 3, 2005, some 21 months after judgment was
rendered and sentence imposed, appellant requested that the clerk's record be
supplemented with the documents in question. It is clear that the documents in the 3RD
SUPPLEMENTAL CLERK'S RECORD that appellant indicates would show a deal regarding
the felony charge between Baraona and the State, were not before, nor called to the
attention of, the trial court at the time judgment was entered. Because the documents
referred to by appellant are ex parte matters neither filed nor offered in proof at the trial,
they cannot be considered part of, nor incorporated in, the record, Chambers, 194 S.W.2d
at 775, and, thus, we have no discretion to permit the supplementation of the record with
the documents contained in the 3RD SUPPLEMENTAL CLERK'S RECORD. Farris v. State,
712 S.W.2d 512, 516 (Tex. Crim. App. 1986). (6) Accordingly, we grant the State's motion to
strike the documents contained in the record at issue. 

 

 Due process requires any agreement or deal for testimony between the State and
a witness be revealed to a defendant, even if evidenced only by suggestions and
innuendos. See Burkhalter v. State, 493 S.W.2d 214, 217 (Tex. Crim. App. 1973) (holding
that where the witness did not directly have an agreement with the State, reversible error
existed where the jury was not informed that the witness's lawyer had an "understanding"
with the State but only told the witness that his testimony "could help him"); cf. Cook v.
State, 940 S.W.2d 623, 629 (Tex. Crim. App. 1996) (recognizing due process obliges State
to disclose exculpatory evidence). Exposing a witness's motivation to testify for or against
the accused or the State is a proper and important purpose of cross-examination. 
Carpenter v. State, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998). Where an agreement or
understanding has been made between a witness and the State for testimony, the jury has
a right to know about it to judge the credibility of the witness. Giglio v. United States, 405
U.S. 150, 155 (1972).

 On direct examination by the State, Baraona testified that he was currently in jail and
that he had a deal with the State to testify in exchange for dismissal of three pending
misdemeanor charges, specifically, for evading arrest, possession, and unlawful carrying
of a handgun. However, Baraona denied the existence of a deal in regards to his pending
felony charge for hindering apprehension. (7) Baraona testified that he contacted Alvear and
informed him that he knew about the murder and told him that, in exchange for his
testimony, he wanted his charges to be dropped and wanted to get out of prison. Baraona
also asked Alvear to arrange things so that Baraona would not be deported to El Salvador. 
Baraona then testified that Alvear informed him that only the three misdemeanor charges
would be dropped and that Alvear would try to do something about the deportation but "that
it was really out of his hands" and there was really no agreement about it. Baraona went
on to explain that, although he could be killed for testifying, he chose to testify to show his
mother that he is no longer associated with the gang known as the "Latin Kings" and
because he wants to change his life. Baraona further commented that he also chose to
testify because the Latin Kings never helped him when he had problems. 

 On cross-examination by defense counsel, Baraona testified that when he initially
met with defense counsel in December of 2002, he was willing to help appellant. But then,
in January 2004, Baraona decided he no longer wanted to help appellant. Defense counsel
attributed Baraona's change of heart to Baraona's October 2003 arrest and questioned
whether Baraona decided to testify to get himself "off." Baraona denied that his change of
heart was a result of his arrest. However, he did admit that he called Alvear and expressed
his willingness to testify in return for something and that Alvear told him he would continue
to help if Baraona cooperated. Baraona testified that his felony charge was still pending
and that he had requested the trial court to appoint counsel to help him defend the charge. 
In addition, he stated that his family had hired a lawyer to help him with his deportation
proceeding. Defense counsel questioned Baraona and suggested that he would not have
hired an immigration attorney unless he knew his felony charge would be dismissed. 
Baraona again denied any arrangement with the State to have the felony charge dismissed. 
Defense counsel proceeded to question Baraona as follows:

Q. You got paid for your testimony didn't you? 


A. I got three misdemeanors dropped.


Q. Right.


A. Which is the least of my problems.


Q. And the probability of getting deported is lessened; is that right?


A. It's not right.


Q. And you got the goodwill of the police to help you out in your
deportation proceeding didn't you? 


A. That's federal, sir. They can't do anything about it. 


Q. Alvear told you he could help you how he could, didn't he? (8) 


 * * * 


Q. You haven't been convicted of that felony that's still pending have you? 


A. That's correct.


Q. And you are not going to get convicted are you?


A. Can't tell the future, sir. 

 

 On re-direct, Baraona again testified that there was no agreement between him and
Alvear to have the felony charged dismissed. He agreed that he would still be facing felony
charges and stated he intended to plead not guilty. 

 On re-cross, defense counsel proceeded to question Baraona as follows:


Q. You are well capable of telling lies aren't you? Whenever it suits your
purposes, right? 


A. What do you mean by suit my purposes?


Q. Well, you're gaining significantly from this one aren't you? Three
misdemeanors being dismissed, you got Alvear saying I'm going to
help you out, giving you a word? 


A. Sir, with all due respect, three misdemeanors are the least of my
problems right now.


Q. Yeah. Who told you to say that?


A. No one, sir. 


Q. Isn't it true that if Alvear or the prosecution gives a good word for you,
you know that's going to help you with the immigration? You don't
know that?


A. The way immigration laws are right now, nothing could really help me
except my - - except asking for asylum.


Q. Isn't it true that that felony that's still pending, you've already been told
you're not going to get a conviction? 


A. I have not been told anything. I've been told that the felony is going to
stick on me.


Q. You are sure that you are not going to be convicted of that felony
aren't you?


 THE COURT: Counsel, hold on. That's been asked and
answered, Counsel. I'm going to let him answer
one more time. Go ahead.


Q. Isn't that why you hired a lawyer to help you on your immigration? 
Wouldn't waste money on a lawyer unless you already knew. 


A. It's not wasting money on a lawyer. It's a pro bar [sic] lawyer.


 The record further reflects that during closing argument, defense counsel
emphasized that Baraona testified so that his felony charge could be dismissed and so that
he would not be deported. Defense counsel argued:

Still got the felony pending. What's going to happen to that felony? I've been
in this gang a long time, it's not going to go. There is a reason it's still
pending. If he performs good, they get the conviction, it's gone. He is not
going to be deported. He gets to stay with his mom. He didn't have anything
else. Baraona is desperate he didn't have anything to sell so he sold out his
friend. 


 The State's closing argument was as follows:


Robert, Baraona, you are the exclusive judges of the credibility of all
witnesses. Did you believe that? Listen to his testimony. He wanted to make
a deal, of course. He's trying to do the best thing he can, but did he tell you
the truth? Did he have a close relationship with [appellant]? Yeah, you saw
it in the letters. Was he a member of the Latin Kings? Yeah, he was. At
what price did he come into this courtroom. Death? Is that worth getting a
couple of misdemeanors? That's a guy who's going to be deported to El
Salvador. His mom is going to get left behind all alone and he wants out. 
This gang has given him nothing but pain and trouble and heart break no
matter how much he tries to help. It's always been a problem for him. Do you
believe he wants out? Did he convince you in that? He is a marked man and
is getting a few misdemeanors dismissed, worth getting a target sign on the
forehead. 


 Appellant contends that the State failed to disclose that Baraona's pending felony
charge would be dismissed. The record indicates that defense counsel extensively cross-examined Baraona regarding any deals pertaining to his felony charge. Nonetheless, there
is no evidence that Baraona was promised anything other than the dismissal of the three
misdemeanors in exchange for his testimony, that the State misled the jury, that the State
allowed Baraona to present false testimony or perjure himself, or that the felony charge was
dismissed. Accordingly, appellant's third issue is overruled.

IV.

 In his fourth issue, appellant contends the trial court abused its discretion in denying
his motion to bar prosecution because the State violated his right to a speedy trial. 

 The right to a speedy trial is guaranteed by the Sixth Amendment to the United
States Constitution and is applicable to the states through the Fourteenth Amendment. 
Barker v. Wingo, 407 U.S. 514, 515 (1972). The Texas Constitution and Texas Code of
Criminal Procedure independently guarantee a speedy trial, but Texas courts look to the
federal courts to determine constitutional rights and apply the Barker test for a speedy-trial
analysis. Ervin v. State, 125 S.W.3d 542, 545 (Tex. App.-Houston [1st Dist.] 2002, no pet.)
(citing Harris v. State, 827 S.W.2d 949, 956 (Tex. Crim. App. 1992)); see Tex. Const. art.
I, § 10; Tex. Code Crim. Proc. Ann. art. 1.05 (Vernon 2005). 

 The Barker test requires that we consider (1) the length of the delay, (2) the reason
for the delay, (3) the defendant's assertion of his right, and (4) the prejudice to the
defendant. Barker, 407 U.S. at 530; Shaw v. State, 117 S.W.3d 883, 888-89 (Tex. Crim.
App. 2003). No single factor is necessary or sufficient to establish a violation of the
defendant's right to a speedy trial. Barker, 407 U.S. at 533; Shaw, 117 S.W.3d at 889. 
Under Barker, courts must analyze federal constitutional speedy trial claims by first weighing
the strength of each of the above factors and then balancing their relative weights in light
of "the conduct of both the prosecution and the defendant." Barker, 407 U.S. at 530. None
of the four factors is "either a necessary or sufficient condition to the finding of a deprivation
of the right of speedy trial." Id. at 533. Instead, they are related factors which must be
considered together along with any other relevant circumstances. Id. No one factor
possesses "talismanic qualities," thus courts must "engage in a difficult and sensitive
balancing process" in each individual case. Id. 

 In conducting a speedy-trial analysis under the Barker test, we review legal issues
de novo, but defer to a trial court's resolution of factual issues. Kelly v. State, 163 S.W.3d
722, 726 (Tex. Crim. App. 2005). (9)
 Because appellant did not succeed on his speedy trial
claim, we must presume the trial court resolved any disputed fact issues in the State's favor,
and we must also defer to the implied findings of fact that the record supports. Zamorano
v. State, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002) (citing State v. Munoz, 991 S.W.2d
818, 821 (Tex. Crim. App. 1999)).

1. The Length of the Delay

 We measure the first factor, length of the delay, from the time the defendant is
arrested or formally accused. Shaw, 117 S.W.3d at 889; Dragoo v. State, 96 S.W.3d 308,
313 (Tex. Crim. App. 2003) (citing United States v. Marion, 404 U.S. 307, 313 (1971)). The
length of delay is, to some extent, a triggering mechanism, so that a speedy trial claim will
not even be heard until passage of a period of time that is on its face unreasonable in the
circumstances. Doggett v. United States, 505 U.S. 647, 651-52 (1992); Barker, 407 U.S.
at 530. "If the accused makes this showing, the court must then consider, as one factor
among several, the extent to which the delay stretches beyond the bare minimum needed
to trigger judicial examination of the claim." Doggett, 505 U.S. at 652. 

 Appellant was arrested on October 14, 2002, was indicted on or about December 4,
2002, and tried (the second time) on February 9, 2004. Appellant contends the 16-month
delay between his arrest and trial was sufficiently lengthy to trigger a Barker speedy-trial
analysis. We agree. The 16-month delay between appellant's arrest and trial is
presumptively unreasonable. See Shaw, 117 S.W.3d at 889 (holding that "in general, delay
approaching one year is sufficient to trigger a speedy-trial inquiry"); Harris v. State, 827
S.W.2d 949, 956 (Tex. Crim. App. 1992) (noting that courts generally hold delays of eight
months or longer presumptively unreasonable). This delay does not necessarily mean that
there is a speedy-trial violation; rather, it triggers a Barker speedy-trial analysis. Ervin, 125
S.W.3d at 546; Harris, 827 S.W.2d at 956. Once a presumptively unreasonable delay is
proven, the court considers, "as one factor among several, the extent to which the delay
stretches beyond the bare minimum needed to trigger judicial examination of the claim." 
Shaw, 117 S.W.3d at 889 (quoting Doggett, 505 U.S. at 652). Here, the 16-month delay
was several months more than the minimum needed to trigger the inquiry. See Shaw, 117
S.W.3d at 889; Harris, 827 S.W.2d at 956. This factor thus weighs in favor of finding a
speedy-trial violation. 

 2. The Reason for the Delay

 In reviewing the second factor, the reasons justifying the delay, we assign different
weights to different reasons-some reasons are valid and serve to justify the delay, while
other reasons are invalid and do not serve to justify it. Shaw, 117 S.W.3d at 889. The
State bears the burden to establish an excuse for the delay. Turner v. State, 545 S.W.2d
133, 137-38 (Tex. Crim. App. 1976); Parkerson v. State, 942 S.W.2d 789, 791 (Tex.
App.-Fort Worth 1997, no pet.). 

 Here, as mentioned above, appellant was arrested on October 14, 2002 and was
indicted on or about December 4, 2002. The initial trial setting was January 27, 2003;
however, on January 23, appellant filed his first motion for continuance along with a motion
requesting court appointed co-counsel and a motion requesting a court appointed
investigator. Appellant requested the continuance so that the trial court could have time to
review the two motions. The trial court reset the trial for March 25, 2003. On March 24,
2003, the trial court heard an oral motion for continuance by appellant. The reason for the
continuance was that the State submitted crime scene evidence for DNA testing and
appellant did not want to begin trial until the results of the testing were returned. The trial
court informed appellant that the results could take three months to be returned. Appellant
consented to the delay and the State joined the continuance. Appellant further expressed
that he would not assert speedy trial rights, per se, but did ask for, and obtain, a bond
reduction in return. Appellant was released on bond on or about September 10, 2003. 
 On August 19, 2003, appellant filed his motion to bar prosecution due to a violation
of his right to a speedy trial. In his motion, appellant stated that defense counsel contacted
the State on August 7, 2003 concerning the DNA test results and that the State informed
him that the results had been in since May 19, 2003. Appellant asserted that the State
violated his right to a speedy trial because it failed to inform him that the DNA results had
been in since May. The trial court denied appellant's motion after a hearing held on
September 19, 2003. The trial court then set trial for November 3, 2003. 

 On October 10, 2003, after complaining of lack of speedy trial, appellant filed yet
another motion for continuance due to defense counsel being out of town on a family
matter. The court granted the motion and trial was reset for November 17, 2003. On
November 7, 2003, appellant filed another motion for continuance. Appellant's counsel
stated he needed additional time to prepare for the case based on newly discovered
evidence and also requested the appointment of an expert. On November, 10, 2003, the
trial court entered an order denying this request for continuance. On November 13, 2003,
the trial court held a pretrial hearing. At the hearing, the State informed the court that
defense counsel was requesting that the court reconsider the order denying the
continuance. Defense counsel acknowledged that he was requesting reconsideration of the
denial of the continuance and that he was waiving any speedy-trial rights relating to this
delay. The court rescinded its order and reset the trial for January 20, 2004. Trial began
on January 20, however, due to an issue concerning one of the jurors, a mistrial was
declared. Trial was re-set and began on February 9, 2004. 

 Here, the State offered the trial court reasons to justify the 16-month delay between
appellant's arrest and second trial: appellant's four motions for continuance. (10) Given
appellant's multiple requests for continuance, the trial court could have reasonably
concluded that appellant himself was responsible for several months of the delay. The
one-month interval between appellant's indictment and first trial may not be counted against
the State, since the State was entitled to a reasonable period in which to prepare its case. 
Shaw, 117 S.W.3d at 889. The only delay arguably attributable to the State is the three-month period between May 19, 2003, when it received the DNA results, and August 7,
2003, when defense counsel was informed that the State had received the DNA results. 
Because the record indicates that appellant caused and agreed to a significant amount of
the delay, the reasons for the delay weigh heavily against appellant. 

3. The Defendant's Assertion of His Right

 The third factor, the defendant's assertion of his right, considers whether the
defendant really desired a speedy trial. Shaw, 117 S.W.3d at 890. "A motion to dismiss
notifies the State and the court of a speedy-trial claim, but a defendant's motivation in
asking for a dismissal rather than a prompt trial is, clearly relevant, and may sometimes
attenuate the strength of his claim." Ervin, 125 S.W.3d at 547 (citing Phillips v. State, 650
S.W.2d 396, 401 (Tex. Crim. App. 1983)). Here, ten months after his arrest, appellant filed
a motion to bar prosecution based on a violation of his right to a speedy trial. Further,
appellant did not request a trial-rather, he merely sought to have his case dismissed. 
Appellant's request for a dismissal for lack of a speedy trial rather than a request for a
speedy trial weakens appellant's claim that the trial court denied him a speedy trial. See
Zamorano, 84 S.W.3d at 651; Phillips, 650 S.W.2d at 401; Parkerson, 942 S.W.2d at 791
(stating "[a]ppellant's request for a dismissal instead of a speedy trial weakens his claim
because it shows a desire to have no trial instead of a speedy trial."). Therefore, the third
Barker factor weighs against appellant.

4. Prejudice to the Defendant Resulting from the Delay

 The final Barker factor focuses on whether the defendant suffered prejudice as a
result of the delay. Barker, 407 U.S. at 532. Prejudice to a defendant is considered in light
of the interests that the right to a speedy trial is intended to protect: (1) to prevent
oppressive incarceration; (2) to minimize the defendant's anxiety; and (3) to limit the
possibility that the defendant's defense will be impaired. Id.

 Here, appellant merely alleges that the 313 days he spent in jail amounts to
oppressive incarceration. However, the record does not indicate that appellant's defense
was impaired. (11) Further, appellant does not allege or offer any evidence that the delay
caused him any anxiety. See Shaw, 117 S.W.3d at 890. This factor thus weighs against
finding a speedy-trial violation. See id.

5. Balancing the Barker Factors

 We note that the delay was presumptively unreasonable, but under Barker the facts
weigh only slightly against the State. When coupled with appellant's multiple requests for
continuance, two of which were filed after he filed his motion to dismiss based on violation
of his speedy-trial rights, and his request for a dismissal rather than a speedy trial, we
conclude that the balance favors no speedy-trial violation. The trial court thus did not err
in denying appellant's motion to bar prosecution for failure to grant a speedy trial. 
Appellant's fourth issue is overruled.

V.

 By his fifth issue, appellant contends the State committed reversible error when it
called a witness to appear before the jury and that witness asserted his Fifth Amendment
privilege not to testify. Appellant contends the alleged error is reversible because "the
subject matter of the trial made it harmful." 

 The record reveals that the State granted the witness, Guadalupe Yanez, immunity. 
A prosecutor may bind himself to an agreement for immunity. See Graham v. State, 994
S.W.2d 651, 656 (Tex. Crim. App. 1999). In doing so, the prosecutor agrees to refrain from
using particular evidence against the witness. See id. A witness who has been granted
immunity for his testimony does not have a valid basis for refusing to testify. See Coffey
v. State, 796 S.W.2d 175, 179 (Tex. Crim. App. 1990) (citations omitted). Because Yanez
had been granted immunity for his testimony, he did not have a valid basis for invoking his
Fifth Amendment right not to testify. Accordingly, the State had the right to compel Yanez's
testimony. 

 We next consider whether calling Yanez as a witness unfairly prejudiced appellant. 
See Coffey, 796 S.W.2d at 177 n.4 (noting that it could have been error had the State
asked witness a series of damaging questions in such a way as to invite jury to assume
answers to each question would have been in the affirmative). Appellant relies on, among
others, Vargas v. State, 442 S.W.2d 686, 687 (Tex. Crim. App. 1969) and Washburn v.
State, 299 S.W.2d 706, 706 (Tex. Crim. App. 1956), to support his contention that the
proceeding prejudiced him. Vargas and Washburn are distinguishable from the present
case. See Perez v. State, 41 S.W.3d 712, 718-20 (Tex. App.-Corpus Christi 2001, no pet.)
(distinguishing Vargas and Washburn in a case with facts similar to the case before us). 


 In this case, Yanez had no valid Fifth Amendment privilege to claim. He refused to
testify and was found in contempt. Therefore, to the extent the State could have sought to
compel Yanez's testimony, appellant was not unfairly prejudiced. Further, unlike Washburn
and Vargas, the State asked no questions whatsoever of Yanez and did not comment on
Yanez's refusal to testify. See id. (12) Accordingly, we conclude appellant was not unfairly
prejudiced. Appellant's fifth issue is overruled.

VI.

 In his sixth issue, appellant contends that he is entitled to a new trial because the
State introduced evidence that was inadmissible and prejudicial. Appellant is essentially
contending that the trial court abused its discretion in denying his motion for mistrial. 
Hawkins v. State, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004).

 Specifically, appellant complains of testimony that he had been arrested in a
separate incident. The following testimony gave rise to appellant's complaint: 

 Q: [State] And how did you determine that he had information
relevant to the murder of Richard Reyes? 

 

 A: [Alvear] He - - he was at the same apartment. That day that he
was arrested [appellant] was also arrested. Defense counsel objected to the testimony as highly prejudicial and a violation of the motion
in limine, requested an instruction to disregard, and moved for mistrial. The trial court
immediately excused the jury and addressed appellant's objection to the testimony. The
trial court overruled appellant's objection and denied his motion for mistrial; however, the
court granted appellant's request for an instruction. 

 Mistrial is appropriate for only "highly prejudicial and incurable errors," and "may be
used to end trial proceedings when faced with error so prejudicial that 'expenditure of further
time and expense would be wasteful and futile.'" Id.; Simpson v. State, 119 S.W.3d 262,
272 (Tex. Crim. App. 2003) (quoting Wood v. State, 18 S.W.3d 642, 648 (Tex. Crim. App.
2000)). The trial court promptly instructed the jury to disregard the objected to testimony. 
See Ovalle v. State, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) ("[O]rdinarily, a prompt
instruction to disregard will cure error associated with an improper question and answer."). 
When a trial court instructs a jury to disregard certain testimony, we presume that the jury
follows the trial court's instructions. Ladd v. State, 3 S.W.3d 547, 567 (Tex. Crim. App.
1999); cf. Wood, 18 S.W.3d at 648 (noting that a trial court is required to grant a motion for
a mistrial only when the improper question is "clearly prejudicial to the defendant and is of
such character as to suggest the impossibility of withdrawing the impression produced on
the minds of the jurors"). After reviewing the record, we cannot conclude that the trial court
abused its discretion in denying appellant's motion for mistrial. (13) Appellant's sixth issue is
overruled.

VII.

 In his seventh issue, appellant argues the State created a racially discriminatory
atmosphere at trial by referring to appellant as "white boy." 

 Appellant contends that, based on a boolean search, he was referred to as "white"
93 times during trial by witnesses, the State, and by the defense. However, appellant only
refers us to three instances in the reporter's record where the State, the defense, and
witness Albert Castillo use the term "white boy." The State also refers us to a couple of
other instances where defense counsel refers to appellant as "white guy" and "white boy." 
 As discussed in issue one above, one of the questions at trial was the in-court and
out-of-court identification of appellant. In addressing the issue of whether the line ups were
impermissibly suggestive, the State, the defense, and witnesses all used the term "white"
to identify appellant. Likewise, in questioning the witnesses, both the defense and the State
described appellant as "white" to discuss his identification as the murderer. Now, on appeal, appellant argues that the term "white" was used by the State to
insert blatant racial overtones during trial. However, in his discussion, appellant does not
extrapolate from the reporter's record how many times and in what manner the State
referred to appellant as "white." We find that appellant's argument, that appellant was
referred to as "white" 93 times or that the State "inserted a callous racial divisiveness into
this case," is not supported by the record. We further hold that appellant has failed to
develop a clear and concise argument for the contentions made and has failed to support
his argument with appropriate citations to authority and to the record. Tex. R. App. P.
38.1(h). (14) Accordingly, appellant's seventh issue is overruled. 

 The judgment of the trial court is affirmed. 

 

 _________________________

 DORI CONTRERAS GARZA,

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and 

filed this the 31st day of August, 2006.
1. Specifically, appellant argued that the problem with the lineup was that, although it was in black and
white, it contained five Hispanic suspects and only one "white" person. 
2. State's Exhibit Number "4A" and Defense Exhibit Number "17." 

3. We note that appellant's argument focuses on whether there was manifest necessity to declare a
mistrial. His argument almost entirely overlooks the exception to the rule providing that jeopardy does not bar
retrial if the defendant consents to mistrial. Appellant's brief delineates the State's objection to the juror and
its willingness to proceed with eleven jurors but fails to acknowledge defense counsel's objection to the juror
and unwillingness to proceed with only eleven jurors. More importantly, he fails to acknowledge that the
defense consented to mistrial. 
4. Alternate jurors had not been selected for this proceeding.
5. Appellant does not contend that prosecutorial misconduct forced a mistrial.
6. Normally, this sort of newly available evidence is presented to an appellate court in one of two ways. 
First, the evidence may have developed during a hearing on defendant's motion for new trial. The evidence
would then be considered part of the record because it evolved from a defendant's trial. See Farris v. State,
712 S.W.2d 512, 516 n.3 (Tex. Crim. App. 1986). Second, the evidence may have become available in a post
conviction writ of habeas corpus situation. See id. Both of these proceedings allow the trial court an
opportunity to either order a new trial or recommend that this Court order a new trial. Id. The trial court does
not have an opportunity to make such an order or recommendation when supplementing the record. Id.
7. Detective Alvear gave similar testimony, stating that there existed an agreement to dismiss
Baraona's pending misdemeanor charges, but that there was no agreement in regards to his pending felony
charge. 
8. This question had been previously asked and answered. After objection by the State, the trial court
instructed defense counsel to "[m]ove on to something else."
9. "The balancing test as a whole . . . is a purely legal question. Legal questions are reviewed de
novo." Zamorano v. State, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002) (citing Johnson v. State, 954 S.W.2d
770, 771 (Tex. Crim. App. 1997)).

10. We find it noteworthy that appellate counsel completely failed to mention in his brief that appellant
himself requested four continuances. Instead, counsel falsely asserts that the State filed a motion for
continuance on March 24, 2003, and then fails to account for the remainder of the complained-of delay which
just so happens to be attributable to appellant. 
11. Appellant alleges the delay allowed the State to improve its position with its star witness Baraona. 
However, appellant has failed to develop any meaningful argument in support of this position and has failed
to direct our attention to any evidence in support of the contention. See Tex. R. App. P. 38.1(h). 
12. The record reflects that Yanez plead the "Fifth" as soon as he was called as a witness. 
Immediately after, the court retired the jury and proceeded to have a lengthy discussion with the State and
defense counsel. The court advised Yanez he had no right to plead the Fifth and that he would be held in
contempt if he refused to testify. Yanez declined to testify and opted to be held in contempt. The jury was
then called back into the court room, at which time a new witness was called to the stand. 
13. Appellant also argues that the issue is one of constitutional dimension requiring reversal. However,
appellant has failed to develop any meaningful analysis or argument in support of this argument. Accordingly,
we do not address this contention. See Tex. R. App. P. 38.1(h). 
14. We note that much of appellant's brief on this issue contains citations to the Texas Constitution
as well as the contention that "the blend of Art. 3a, Art. 19, and Art. 29, create a unique situation for
constitutional error . . . ." However, appellant has failed to apply the law to the facts and has failed to develop
any meaningful argument in support of his contention. Accordingly, we do not address this contention. Tex.
R. App. P. 38.1(h).